**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002

**RENNE PUBLIC LAW GROUP**
Louise H. Renne (SBN 36508)
  lrenne@publiclawgroup.com
Ruth M. Bond (SBN 214582)
  rbond@publiclawgroup.com
Ann M. Ravel (Of Counsel) (SBN 62139)
  ann.ravel@gmail.com
350 Sansome Street, Suite 300
San Francisco, California 94101
Telephone:    (415) 848-7200
Facsimile:    (415) 848-7230

*Attorneys for Plaintiff EllieMaria Toronto ESA*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| ELLIEMARIA TORONTO ESA, derivatively on behalf of NORTONLIFELOCK INCORPORATED, <br><br> Plaintiff, <br><br> vs. <br><br> VINCENT PILETTE, GREGORY S. CLARK, FRANK E. DANGEARD, SUE BARSAMIAN, NORA DENZEL, PETER A. FELD, KENNETH Y. HAO, DAVID W. HUMPHREY, V. PAUL UNRUH, ERIC K. BRANDT, DALE L. FULLER, ANITA M. SANDS, SUZANNE M. VAUTRINOT, and DOES 1–30, <br><br> Defendants, <br><br> – and – <br><br> NORTONLIFELOCK INCORPORATED, <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br> 1. **BREACH OF FIDUCIARY DUTY;** <br> 2. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;** <br> 3. **ABUSE OF CONTROL;** <br> 4. **UNJUST ENRICHMENT; AND** <br> 5. **VIOLATION OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934.** <br><br> **DEMAND FOR JURY TRIAL** |

# Table of Contents

I.      INTRODUCTION ...........................................................................................1

II.     NATURE AND SUMMARY OF THE ACTION .........................................6

III.    JURISDICTION AND VENUE..................................................................12

IV.     INTRADISTRICT ASSIGNMENT ...........................................................13

V.      THE PARTIES.............................................................................................13

    A.     Plaintiff ...........................................................................................13

    B.     Nominal Defendant .........................................................................13

    C.     Executive Officer Defendants.........................................................14

    D.     Director Defendants.........................................................................14

    E.     Doe Defendants ...............................................................................16

    F.     Unnamed Participants ......................................................................16

VI.     RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS........17

    A.     Responsibilities of the Individual Defendants.................................17

    B.     Fiduciary Duties of the Individual Defendants................................19

    C.     Breaches of Fiduciary Duties by the Individual Defendants.......................20

    D.     Conspiracy, Aiding and Abetting, and Concerted Action............................20

    E.     The Directors' Roles and Committees at NortonLifeLock............................22

VII.    SUBSTANTIVE ALLEGATIONS...............................................................23

    A.     NortonLifeLock Has Falsely Represented That It Has Made Substantial Progress Towards Diversity and Inclusion in Its Workplace and on the Board.........................................................24

    B.     The Nominating and Governance Committee is Responsible for Nominating Individuals to the Company's Board.........................................28

i

C.    At All Relevant Times, the Individual Defendants Have Had Actual Knowledge That, Contrary to Its Public Statements, NortonLifeLock Was Not Achieving Success With Respect to Its Diversity and Inclusion Initiatives ............................................................30

D.    False and Misleading 2018, 2019, and 2020 Proxy Statements Approved by the Director Defendants ...........................................32

E.    NortonLifeLock's Nominating and Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board .........................................................47

F.    The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination ......................................................................................53

G.    The Unjust Compensation Awarded to Defendants Pilette and Clark.......54

VIII.    THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES ...........................57

IX.    DEMAND FUTILITY.................................................................................57

A.    Demand on the Board is Excused as Futile ....................................58

B.    Demand Is Excused Because a Majority of the Director Defendants is Either Not Independent or is Conflicted Because These Defendants Face a Substantial Likelihood of Liability Arising From Their Misconduct...........................................................................................60

C.    The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith...............62

X.    CAUSES OF ACTION ......................................................................63

XI.    PRAYER FOR RELIEF .....................................................................68

ii

SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff EllieMaria Toronto ESA ("Plaintiff") submits this Verified Shareholder Derivative Complaint against certain directors and officers of nominal defendant NortonLifeLock Incorporated ("NortonLifeLock" or the "Company") for, *inter alia*, violations of the Securities Exchange Act of 1934 ("Exchange Act") and breaches of fiduciary duties.   In support of these claims, Plaintiff alleges the following upon (1) personal knowledge with respect to the matters pertaining to herself; and (2) information and belief with respect to all other matters, based upon the investigations undertaken by her counsel, which include a review of NortonLifeLock's legal and regulatory filings, press releases, analyst reports, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.    INTRODUCTION

"We are a country suffering from racial inequality. And we want the inequality and suffering to end.  Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers."[1]

"NortonLifelock is committed to building a diverse, safe, and inclusive workplace culture."[2]

---

[1] *See* John Streur, "*More Engagement Needed to Get Companies to Address Racial Inequality Risks and Issues,*" CALVERT RESEARCH AND MANAGEMENT, June 19, 2020, available at https://www.calvert.com/impact.php?post=more-engagement-needed-to-get-companies-to-address-racial-inequality-risks-and-issues-&sku=35910, last visited June 29, 2020.

[2] *See* https://www.nortonlifelock.com/us/en/corporate-responsibility/diversity-and-inclusion/, last visited July 20, 2020.

1

1.      Despite NortonLifeLock's statement that it is committed to diversity and inclusion, NortonLifeLock has failed to create any diversity at the very top of the Company — the Board of Directors (the "Board").  The NortonLifeLock Board has lacked diversity at all relevant times, and is one of the few publicly-traded companies without a single African American director.

2.      Back in the 1960s, almost every corporate board looked like the following:



Board of directors attend a meeting in 1960. CENTRAL PRESS GETTY.

3.      While most of corporate America has made substantial progress in diversification since the 1960s, NortonLifeLock still does not have a single African American on its Board.  The following are the current members of the Board:

///

///

///

2

SHAREHOLDER DERIVATIVE COMPLAINT

**Frank E. Dangeard**
Chairman of the Board, Member of Audit and Nominating and Governance Committee

**Sue Barsamian**
Chair of Nominating and Governance Committee, Member of Compensation Committee, Director

**Peter A. Feld**
Chair of Compensation Committee, Member of Nominating and Governance Committee, Director





**David Humphrey**
Director

**Nora Denzel**
Member of Audit and Compensation Committee, Director

**Gregory S. Clark**
Former Chief Executive Officer





3

SHAREHOLDER DERIVATIVE COMPLAINT

**Kenneth Hao**
Director

**Vincent Pilette**
Chief Executive Officer,
Director

**Erik K. Brandt**
Chair of Audit Committee,
Director





**V. Paul Unruh**

Director



4.      While NortonLifeLock's Board contains one Asian (Mr. Hao), Hao was not appointed to the Board to increase diversity, but instead because his employer, Silver Lake, invested in the Company.

5.      At NortonLifeLock, it is not just the Board that lacks any African American individuals; there are no African Americans among the Company's senior executives:

/ / /

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Vincent Pilette**
Chief Executive Officer,
NortonLifeLock
Incorporated

**Samir Kapuria**
President, NortonLifeLock
Incorporated

**Natalie Derse**
Chief Financial Officer,
NortonLifeLock
Incorporated





**Bryan Ko**
General Counsel &
Corporate Secretary,
NortonLifeLock
Incorporated

**Kara Jordan**
Chief People & Culture
Officer, NortonLifeLock
Incorporated

**Robert Clarkson**
Chief Commercial Officer





5

SHAREHOLDER DERIVATIVE COMPLAINT

**Krista Todd**
Vice President of Marketing
& Communiations,
NortonLifeLock
Incorporated

**Gagan Singh**
Chief Product Officer,
NortonLifeLock
Incorporated

**Darren Shou**
Head of Technology,
NortonLifeLock
Incorporated







**Sameer Khera**
Chief Information Officer

**Matthew Brown**
Chief Accounting Officer



## II.     NATURE AND SUMMARY OF THE ACTION

6.     NortonLifeLock's Directors, wishing to avoid public backlash, have repeatedly made misrepresentations in the Company's public statements by claiming to have a policy of being committed to diversity and inclusion at the Company.

7.     In reality, though, NortonLifeLock's Board and senior executive officers remain devoid of any Blacks and any meaningful representation of other minorities.

8.     Even NortonLifeLock's Chief People & Culture Officer, Kara Jordan, is white:

6

SHAREHOLDER DERIVATIVE COMPLAINT



9.      At NortonLifeLock, the Company's workforce and Board remain conspicuously devoid of any meaningful percentage of Black and minority individuals.

10.      **At NortonLifeLock, only 1% of the Company's leadership is comprised of African Americans**, despite the fact that African Americans make up over 13% of the U.S. population.[3]  Its total U.S. workforce population is only 2% African American.

11.      NortonLifeLock has five times more Hispanic than Black workers, which comprise 5% of its workforce.[4]

12.      In reality, NortonLifeLock has made no real efforts to promote diversity on its Board and among its senior executives.  Indeed, the word "diversity" only appears seven (7) times in NortonLifeLock's 2019 Proxy Statement.

13.      The Company's 2019 Proxy stated: "**Diversity**.  In addition to a diverse portfolio of professional background, experiences, knowledge and skills, **the**

---

[3] *See* the Company's 2019 Corporate Responsibility Report, at p. 14, available at file:///C:/Users/fbottini/Downloads/2019-corporate-responsibility-report-en%20(1).pdf, last visited July 20, 2020.  NortonLifeLock sold its Symantec business to Broadcom in 2019, so its 2019 report still contains some information about the Symantec business in addition to the NortonLifeLock business.

[4] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

1    *composition of the Board should reflect the benefits of diversity as to gender, race,*

2    *ethnic, cultural and geographic backgrounds that reflect the composition of our global*

3    *investors, customers, employees and partners.*"

4        14.    Despite this concession, NortonLifeLock's Board contains zero African

5    American individuals and only one minority (Kenneth Hao), who is Asian.  However,

6    Mr. Hao was not appointed to the Board to increase diversity, but instead because his

7    employer, Silver Lake, invested in the Company.  As the Company's 2019 Proxy admits:

8
9         On February 3, 2016, NortonLifeLock entered into an investment
agreement with investment entities affiliated with Silver Lake, a private

10         equity firm, relating to the issuance to Silver Lake of $500 million principal
amount of 2.5% convertible unsecured notes, due in 2021. ***In connection***

11         ***with the investment, Kenneth Y. Hao, a managing partner and managing***
***director of Silver Lake, was appointed to our Board.***

12

13         On June 12, 2016, NortonLifeLock entered into an investment agreement
with investment entities affiliated with Silver Lake and Bain Capital

14         relating to the issuance of $1.25 billion aggregate principal amount of 2.0%
convertible unsecured notes due in 2021. Pursuant to the investment

15         agreement, Silver Lake has agreed to purchase $500 million aggregate
principal amount of the notes, and Bain Capital, private equity firm of

16         which David W. Humphrey is a managing director, has agreed to purchase

17         $750 million aggregate principal amount of the notes. The transactions
contemplated by this investment agreement closed concurrently with the

18         closing of the Blue Coat acquisition on August 1, 2016. In connection with

19         the investment, Mr. Humphrey was appointed to our Board.[5]

20        15.    Despite being called out ***seven years ago*** for not having a single Black

21    individual on its Board, NortonLifeLock still does not have any African Americans on its

22    Board.  *See "75 Companies Without Black Board Members,"* BLACK ENTERPRISE, Sept. 10,

23

24

25    ––––––––––––––––

26       [5] *See* 2019 Proxy at pp. 69-70.

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

1   2013.[6]

2       16.    As stated by Crystal Ashby, president and CEO of the Executive

3   Leadership Council, an organization of black senior executives that works to increase

4   inclusivity in business leadership: "Companies need to be intentional about increasing

5   the diversity of their executive leadership teams.  The culture of an organization is

6   cultivated by its leaders."

7       17.    As one individual aptly stated recently: "We've seen anemic progress to

8   date but *this is a watershed moment that must spur private and public boards into*

9   *accelerated action*," says Janet Foutty, executive chair of the board for Deloitte, which

10  has separately researched board diversity among Fortune 500 companies.[7]

11      18.    Founded in 1989, NortonLifeLock today in 2020 has: (1) zero African-

12  Americans on its Board; and (2) zero African-Americans among its senior executive

13  ranks.

14      19.    The Director Defendants named herein all signed each of NortonLifeLock's

15  annual proxy statements.  With such signatures come an obligation to ensure that the

16  statements in the Proxy were true and accurate, and to correct any misleading

17  statements.  They failed to do so.

18      20.    NortonLifeLock's Directors have deceived stockholders and the market by

19  claiming to have concrete and specific inclusion and diversity programs that are

20  measurable and produce actionable tasks.  In doing so, the Directors have breached their

21  duty of candor and have also violated the federal securities laws.  Their conduct has also

22  irreparably harmed NortonLifeLock.

23

24      [6] Available at https://www.blackenterprise.com/75-companies-without-black-board-members/, last visited July 20, 2020.

25      [7] *See* Kerri Anne Renzulli, "*The 20 Largest U.S. Companies Without a Black Person on Their Board*," NEWSWEEK, June 17, 2020.

26

27

28

9

21.     Moreover, greater diversity is in NortonLifeLock's own interest.   Studies show that greater board diversity is associated with increased profits. ***A McKinsey report found that companies with the most ethnically or culturally diverse boards worldwide were 43 percent more likely to experience higher profits***.

22.     The shareholder derivative lawsuit has been the only judicial mechanism for shareholders to hold directors accountable for engaging in wrongdoing.   Courts have long recognized that derivative suits play an important role in corporate governance where directors fail to do their jobs:

> The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution. Where a derivative suit is against outsiders for wrongs against the corporation the directors can usually be expected to decide impartially on the advisability of suing. But the management cannot be expected to sue themselves for their own misdeeds.

*Pearce v. Super. Ct.*, 149 Cal. App. 3d 1058, 1065 (1983); *see also Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 297 (2004); *accord Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)).   As the California Supreme Court recognized in *Jones v. H. F. Ahmanson & Co.*, where, as here, the company's board and management fail to perform their duties, stockholders have a "right" to bring derivative actions.   *See* 1 Cal. 3d 93, 107 (1969).   The courts of Delaware, NortonLifeLock's state of incorporation, likewise acknowledge that derivative actions serve an important function: "The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), o*verruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

23.     Plaintiff, derivatively on behalf of NortonLifeLock, seeks the following relief from the Director Defendants:

(a)     The Chief People and Culture Officer should immediately create a substantive plan for diversity and inclusion for the Board, upper management

10

levels, and throughout the corporation with the authority to implement such a plan; and if unable to do so, the Chief People and Culture Officer shall be replaced by a person of color with the skill set and authority to do so;

(b)     At least one of NortonLifeLock's directors should immediately resign prior to the Company's annual meeting set for September 8, 2020 and a Black person nominated to the Board at that time. Thereafter, within a year and prior to the next annual meeting at least one other person of color shall be nominated to the Board;

(c)     All Director Defendants named in this suit should return all of their 2020 compensation received from NortonLifeLock (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Blacks and minorities in corporate America;

(d)     NortonLifeLock should agree to publish an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at NortonLifeLock;

(e)     NortonLifeLock should create a $500 million fund to hire Blacks and minorities, promote minorities to more management positions at the Company, establish and maintain a mentorship program at NortonLifeLock for minorities that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(f)     NortonLifeLock should require annual training of its entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics; and

(g)     NortonLifeLock should immediately set specific goals with respect to the number of Blacks and minorities to hire at the Company over the next five years, and NortonLifeLock should adopt a revised executive compensation

11

program that makes 30% of executives' compensation tied to the achievement of the diversity goals.

24.     The Individual Defendants' misconduct has caused severe financial and reputational damage to NortonLifeLock.

25.     While underpaying minorities and women, NortonLifeLock's CEO and executives have used the money saved to pay themselves huge amounts.  *In fiscal year 2020, the Company paid its CEO Vincent Pilette total compensation of $20,596,491.  In fiscal year 2018, the Company paid its CEO Gregory Clark total compensation of $ 17,347,581.  In fiscal year 2019, the Company paid its CFO Nick Noviello $ 13,299,795 and its President Samir Kapuria $10,976,180.*

26.     As set forth below, Defendants' conduct constitutes bad faith and disloyal acts, giving rise to claims that fall outside the scope of the business judgment rule and outside of permissible indemnification by NortonLifeLock.  As a result, all members of the Board face a substantial likelihood of liability and any demand on them to bring this case would be a futile and useless act.

### III.    JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

28.     This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

29.     This Court has jurisdiction over Defendants.  Each Defendant is either a

12

resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice. Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets. The Court has jurisdiction over NortonLifeLock because the Company was headquartered in Mountain View, California for most of the time relevant to this complaint and has substantial business operations in California.

30. Venue is proper in this District pursuant to Section 27 of the Exchange Act. Venue is also proper under 28 U.S.C. § 1391(b) because: (a) NortonLifeLock maintained its principal place of business in this District for most of the time relevant to this complaint; and (b) many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. The Company's 2018 and 2019 Proxy Statements and annual meetings were disseminated in and held in this District in Mountain View, California.

## IV.   INTRADISTRICT ASSIGNMENT

31. In compliance with Local Rule 3-2(b), Plaintiff requests that this action be assigned to the San Jose Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of Santa Clara.

## V.   THE PARTIES

### A.   Plaintiff

32. Plaintiff is a current shareholder of NortonLifeLock, and has continuously held NortonLifeLock stock at all relevant times. Plaintiff is a citizen of New Jersey.

### B.   Nominal Defendant

33. NortonLifeLock Incorporated is a Delaware corporation. Prior to a recent

13

name change in November 2019, the Company was called Symantec and maintained its headquarters at 350 Ellis Street, Mountain View, California 94043. The Company recently moved its headquarters to 60 E. Rio Salado Parkway, Suite 1000, Tempe, Arizona 85281, but still maintains significant operations in California.

**C.  Executive Officer Defendants**

34.  Defendant Vincent Pilette has served as chief executive officer of NortonLifeLock since May 2019, and serves on the Company's Board.  Pilette previously served as the Company's CFO.  The Company paid Pilette total compensation in excess of $20 million in fiscal year 2020. Pilette is a citizen of California and maintains his residence in Menlo Park, California.

35.  Defendant Gregory S. Clark was a director of the Company from 2016 until May 2019.  Clark served as CEO of the Company prior to Mr. Pilette's tenure.  Clark is a citizen of California.

**D.  Director Defendants**

36.  Defendant Frank E. Dangeard has served as the Chairman of the Board and has been a director of the Company since 2007.  Dangeard is a member of the Nominating & Governance Committee, Audit Committee, and Compensation Committee.  Dangeard is a citizen of New York.

37.  Defendant Sue Barsamian has served as a director since January 7, 2019 and currently is a member of NortonLifeLock's Nominating & Governance Committee and Compensation Committee.  Barsamian is a citizen of California and maintains her residence in Menlo Park, California.

38.  Defendant Nora Denzel has been a director of NortonLifeLock since 2019 and serves on the Audit Committee.  Denzel is a citizen of California and maintains her residence in Saratoga, California.

39.  Defendant Peter A. Feld is a director of NortonLifeLock and has been since 2018, and serves as a member of the Compensation Committee and Nominating &

1  Governance Committee.  Feld is a citizen of New York.

2      40.     Defendant Kenneth Y. Hao has served as a director of the Company since

3  2016. He currently serves as a Managing Partner and Director of Silver Lake Partners

4  and was appointed to the Board of NortonLifeLock as a result of financing deals

5  between Silver Lake and the Company.  Hao is a citizen of California and maintains his

6  residence in Hillsborough, California.

7      41.     Defendant David W. Humphrey has served as a director of the Company

8  since 2016. He currently is a Managing Director of Bain Capital. Humphrey is a citizen of

9  Massachusetts.

10     42.     Defendant V. Paul Unruh has served as a director of the Company since

11 2005. He currently is the Chairman of NortonLifeLock's Audit Committee.  On July 22,

12 2020, the Company announced that Unruh would step down from the Board after the

13 Company's 2020 Annual Meeting, which is set for September 8, 2020.  Unruh is a citizen

14 of California and maintains his residence in Orinda, California.

15     43.     Defendant Eric K. Brandt is a director of the Company and member of the

16 Audit Committee. Brandt is a citizen of California and maintains his residence in Corona

17 del Mar, California.

18     44.     Defendant Dale L. Fuller served as a director of the Company from 2018

19 until December 2019.   He served on NortonLifeLock's Nominating & Governance

20 Committee.  Fuller is a citizen of California and maintains his residence in Menlo Park,

21 California.

22     45.     Defendant Anita M. Sands served as a director of the Company from 2013

23 until December 2019.   She served on NortonLifeLock's Audit Committee.   Sands is

24 currently a resident of New York, and was a resident of San Francisco, California during

25 the relevant time period, residing at 2425 Devisidero Street, San Francisco, California

26 94115 from 2015 to 2019.

27     46.     Defendant Suzanne M. Vautrinot served as a director of the Company from

28

15

SHAREHOLDER DERIVATIVE COMPLAINT

2013 until December 2019. She served on NortonLifeLock's Audit Committee. Vautrinot also serves on the Board of Wells Fargo and was on the Board during the "fake account" scandal that tarnished Wells Fargo's reputation and resulted in hundreds of millions of dollars in settlements with private plaintiffs and governmental entities. In 2020, a U.S. House Financial Services committee issued a report entitled "The Real Wells Fargo: Board & Management Failures, Consumer Abuses and Ineffective Regulatory Oversight" that lambasted Wells Fargo's response to regulatory orders since the fake account scandal began. Vautrinot is a citizen of Colorado.

47.     Defendants Clark and Pilette are referred to herein as the "Executive Officer Defendants." The rest of the Defendants identified above, including Pilette and Clark, are referred to herein as the "Director Defendants." Collectively, all defendants are referred to herein as the "Individual Defendants."

**E.     Doe Defendants**

48.     Except as described herein, Plaintiff is ignorant of the true names of defendants sued as Does 1 through 30, inclusive, and therefore, Plaintiff sues these defendants by such fictitious names. Following further investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants are NortonLifeLock officers, other members of management, employees, and/or consultants or third parties who were involved in the wrongdoing detailed herein. These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

**F.     Unnamed Participants**

49.     Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein. The individuals and entities

SHAREHOLDER DERIVATIVE COMPLAINT

acted in concert by joint ventures and by acting as agents for principals, to advance the objectives of the scheme and to provide the scheme to benefit Defendants and themselves to the detriment of NortonLifeLock.

## VI.    RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Responsibilities of the Individual Defendants

50.    Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.

51.    Board Members and Executive Officers are held to the highest level of ethics and compliance with the law.

52.    The Company's corporate governance principles state:

Our Board of Directors is charged with representing the interests of our stockholders and ensuring that the company is managed in alignment with our commitment to the principles of corporate responsibility.

53.    NortonLifeLock also states that:

**We continually work to strengthen our performance. Below are a few highlights of our corporate governance practices:**

● The nominating committee of the Board of Directors receives regular briefings on NortonLifeLock's corporate responsibility objectives and performance.

● The compensation committee of the Board of Directors undertakes rigorous review of proposed executive compensation packages to ensure a balance between fair compensation and NortonLifeLock's ability to attract and retain top talent. The process includes a comprehensive performance evaluation, comparison with other companies' practices, and consultation with compensation experts.

● We review our internal controls and strengthen our policies and procedures to ensure that our accounting systems are accurate and reliable.

SHAREHOLDER DERIVATIVE COMPLAINT

● We disclose our trade association affiliations and our company position on various public policy issues.

54. The Board is responsible for oversight and compliance with the Company's internal controls regarding diversity, anti-discrimination, pay equity, hiring and promotion. As alleged herein, the Company's Board of Directors failed to act in good faith by failing to ensure compliance with these policies and controls. These policies existed on paper, but were knowingly disregarded.

55. The Company's 2019 Proxy Statement stated the following with respect to the Board's role in risk oversight:

**Board's Role in Risk Oversight**

The Board executes its risk management responsibility directly and through its committees.



| Board of Directors | |
| --- | --- |
| **Audit Committee** | • Primarily responsible for overseeing our Company's enterprise risk management.<br>• Receives updates and discusses individual and overall risk areas durin its meetings, including our Company's financial risk assessments, risk management policies and major financial risk exposures and the steps management has taken to monitor and control such exposures, which exposures span a variety of areas, including litigation, reputational and policy matters, financial reporting, data privacy and cybersecurity. |
| **Compensation Committee** | • Oversees risks associated with our compensation policies and practice with respect to both executive compensation and employee compensation generally.<br>• Receives reports and reviews whether Norton Life Lock's compensation policies and practices to confirm that they are not reasonably likely to have a material adverse effect on our Company or encourage unnecessary risk-taking. |
| **Nominating and Governance Committee** | • Oversees the management of risks that may arise in connection with our Company's governance structures and processes. |

18

SHAREHOLDER DERIVATIVE COMPLAINT

56.     The Board has obviously been aware at all relevant times that it is all-white and lacks diversity.  The Board and the Executive Officers also knew that diversity was lacking in the Company's workforce.  The Defendants' knowledge of the problems is reflected by their efforts to conceal the lack of diversity and discrimination.

57.     The Board knew the Company had policies in place on paper, but they failed to give the policies any teeth or enforcement.  The Board's conduct represented hypocrisy, bad faith, and disloyal conduct.  The Board had a duty to cause the Company to comply with the law and its own Corporate Governance Principles, and failed to do so.

58.     The direct involvement of NortonLifeLock's Board makes them interested in the outcome of this litigation because they face a substantial likelihood of liability.  Demand is thus futile.

**B.     Fiduciary Duties of the Individual Defendants**

59.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continue to owe NortonLifeLock and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NortonLifeLock in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of NortonLifeLock and not in furtherance of their personal interest or benefit.

60.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of NortonLifeLock were required to, among other things:

(a)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the

19

1   Company's assets, and to maximize the value of the Company's stock; and

2       (b)   remain informed as to how NortonLifeLock conducted its

3   operations, and, upon receipt of notice or information of imprudent or

4   unsound conditions or practices, make reasonable inquiry in connection

5   therewith, and take steps to correct such conditions or practices and make

6   such disclosures as necessary to comply with applicable laws.

7   **C.   Breaches of Fiduciary Duties by the Individual Defendants**

8       61.   The conduct of the Individual Defendants complained of herein involves a

9   knowing and culpable violation of their obligations as officers and directors of

10  NortonLifeLock, the absence of good faith on their part, and a reckless disregard for

11  their duties to the Company.

12      62.   The Individual Defendants breached their duty of loyalty and good faith

13  by allowing defendants to cause, or by themselves causing, the Company to cover up

14  NortonLifeLock's discrimination, and caused NortonLifeLock to incur substantial

15  damage.

16      63.   The Individual Defendants, because of their positions of control and

17  authority as officers and/or directors of NortonLifeLock, were able to and did, directly or

18  indirectly, exercise control over the wrongful acts complained of herein.  The Individual

19  Defendants also failed to prevent the other Individual Defendants from taking such

20  improper actions.  As a result, and in addition to the damage the Company has already

21  incurred, NortonLifeLock has expended, and will continue to expend, significant sums

22  of money.

23  **D.   Conspiracy, Aiding and Abetting, and Concerted Action**

24      64.   At all relevant times, Individual Defendants were agents of the remaining

25  Individual Defendants, and in doing the acts alleged herein, were acting within the

26  course of scope of such agency.  The Individual Defendants ratified and/or authorized

27  the wrongful acts of each of the other Individual Defendants.   The Individual

28

20

SHAREHOLDER DERIVATIVE COMPLAINT

1  Defendants, and each of them, are individually sued as participants and as aiders and

2  abettors in the improper acts, plans, schemes, and transactions that are the subject of this

3  Complaint.

4      65.    In committing the wrongful acts alleged herein, the Individual Defendants

5  have pursued, or joined in the pursuit of, a common course of conduct, and have acted

6  in concert with and conspired with one another in furtherance of the improper acts,

7  plans, schemes, and transactions that are the subject of this Complaint.  In addition to

8  the wrongful conduct herein alleged as giving rise to primary liability, the Individual

9  Defendants further aided and abetted and/or assisted each other in breaching their

10  respective duties.

11     66.    The Individual Defendants engaged in a conspiracy, common enterprise,

12  and/or common course of conduct, by failing to maintain adequate internal controls at

13  the Company and covering up discrimination at the Company.

14     67.    During all times relevant hereto, the Individual Defendants, collectively

15  and individually, initiated a course of conduct that was designed to and did circumvent

16  the internal controls at the Company and caused the Company to cover up

17  NortonLifeLock executives' discrimination.  In furtherance of this plan, conspiracy, and

18  course of conduct, the Individual Defendants, collectively and individually, took the

19  actions set forth herein.

20     68.    The purpose and effect of the Individual Defendants' conspiracy, common

21  enterprise, and/or common course of conduct was, among other things, to disguise the

22  Individual Defendants' violations of law, breaches of fiduciary duty, and waste of

23  corporate assets, and to conceal adverse information concerning the Company's

24  operations.

25     69.    The Individual Defendants accomplished their conspiracy, common

26  enterprise, and/or common course of conduct by intentionally circumventing internal

27  controls at the Company and causing the Company to cover up discrimination at the

28

21

SHAREHOLDER DERIVATIVE COMPLAINT

Company.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## E.    The Directors' Roles and Committees at NortonLifeLock

71.    The following chart sets forth the directors of NortonLifeLock as set forth in the Company's 2019 Proxy Statement and the committees on which they serve:

| Name | Age | Principal Occupation | Independent | AC | CC | NGC |
|------|-----|---------------------|-------------|----|----|----|
| Sue Barsamian | 60 | 2019 | Director | Yes | ●■ | ●C | 1 |
| Frank E. Dangeard | 61 | 2007 | Managing Partner, Harcourt | Yes | ●■ | ●■ | 1 |
| Nora M. Denzel | 57 | n/a* | Nominee | Yes | ●■ | | 3 |
| Peter A. Feld | 40 | 2018 | Managing Member and Head of Research, Starboard Value LP | Yes | ●C | ●■ | 1 |
| Kenneth Y. Hao | 51 | 2016 | Managing Partner and Managing Director, Silver Lake Partners | Yes | | | 2 |
| David W. Humphrey | 42 | 2016 | Managing Director, Bain Capital | Yes | | | 1 |
| Vincent Pilette | 47 | n/a* | CEO | No | | | 0 |
| V. Paul Unruh | 71 | 2005 | Director | Yes | ●C | | 0 |

22

SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VII.    SUBSTANTIVE ALLEGATIONS

72.    NortonLifeLock Inc. (formerly known as Symantec), is an American software company headquartered in Tempe, Arizona. The Company provides cybersecurity software and services. NortonLifeLock is a Fortune 500 company and a member of the S&P 500 stock-market index. The Company also has development centers in Pune, Chennai and Bangalore.

73.    On October 9, 2014, Symantec declared it would split into two independent publicly-traded companies by the end of 2015. One company would focus on security, the other on information management. On January 29, 2016, Symantec sold its information-management subsidiary, named Veritas Technologies (which Symantec had acquired in 2004), to The Carlyle Group.

74.    On August 9, 2019, Broadcom Inc. announced it would be acquiring the Enterprise Security software division of Symantec for $10.7 billion, after having attempted to purchase the whole Company. The sale closed November 4, 2019, and subsequently, the Company adopted the NortonLifeLock name. It also relocated its headquarters to Tempe, Arizona from Mountain View, California in approximately December 2019.

75.    NortonLifeLock's Board enjoys the undesirable distinction of being one of the few publicly-traded companies in the United States with no African Americans on the Board.

76.    The lack of diversity at the top at NortonLifeLock is significant.  The Board bears ultimate responsibility for ensuring the Company's compliance with federal and state laws prohibiting discrimination based on race, gender, and other factors.  Diversity in the workforce is a strong indication of a lack of discrimination; conversely, a lack of diversity provides a strong indication that discrimination is present.

77.    If the NortonLifeLock Board is vested with the responsibility of "Leading by Example," it has failed miserably at that role with respect to diversity; the Board still,

23

1  in 2020, lacks any Black individuals, and only one minority (Hao), who was put on the

2  Board in connection with an investment by Silver Lake into the Company, not in order to

3  increase diversity.  *See* NortonLifeLock 2019 Proxy at p. 69: "On February 3, 2016,

4  NortonLifeLock entered into an investment agreement with investment entities affiliated

5  with Silver Lake, a private equity firm, relating to the issuance to Silver Lake of $500

6  million principal amount of 2.5% convertible unsecured notes, due in 2021. In connection

7  with the investment, Kenneth Y. Hao, a managing partner and managing director of

8  Silver Lake, was appointed to our Board."

9      78.    Even NortonLifeLock's Chief People & Culture Officer is a white

10  individual.  The Company's lack of diversity stands in stark contrast to its statement that

11  "*NortonLifeLock (formerly Symantec) is committed to* conducting our business with

12  attention to, and respect for, ethical operation, *a diverse and inclusive workforce*, the

13  environment, and positive societal impact."[8]

14      **A.    NortonLifeLock Has Falsely Represented That It Has Made Substantial
       Progress Towards Diversity and Inclusion in Its Workplace and on the
15     Board**

16      79.    NortonLifeLock has represented that it promotes and achieves diversity

17  and inclusion at the Company.  For example, the Company's website states:

18      **NortonLifeLock is committed to building a diverse, safe, and inclusive
19      workplace culture.**

20      A culture where everyone is respected and encouraged to thrive. We
21      believe that an equitable and inclusive work environment, one where
       people can be their authentic selves, can help amazing things come to life.
22

23      At NortonLifeLock, everyone has a voice. Diverse points of view help us
24      make better business decisions, to make sure the products and services we

25      _____

        [8]  *See*  https://www.nortonlifelock.com/us/en/corporate-responsibility/corporate-
26      responsibility-report/, last visited July 20, 2020.

27

28
                                      24

offer meet the needs of the broad spectrum of people we serve worldwide. This starts with building teams with different backgrounds and perspectives. It helps us understand our customers better, enables us to respond to new trends more rapidly, and stimulates innovation. *We invest in diversity not just because it's the right thing to do but because it translates to a higher performing industry, company... and bottom line.*.[9]

80.     The Individual Defendants have not only caused the Company to make vague statements about a "commitment" to diversity, but have approved false statements that NortonLifeLock has been successful in those efforts:

**We have a multifaceted approach when it comes to driving diversity, equity and inclusion at NortonLifeLock**

●     Continuously improve all touchpoints in the employee lifecycle: *focusing on how we attract, retain, and develop the best diverse cyber security talent in the world*.

●     *Cultivate an inclusive workplace* where everyone feels they belong and can thrive by providing learning and development opportunities to employees at all levels.

●     *Ensure that doing the right thing is built into our very foundation by advising, crafting, and implementing globally inclusive policies and guidelines*.

●     Improve our Employee Resource Groups' impact on key business objectives by investing more and partnering closely with internal and external stakeholders.

●     Join the conversation and *be true thought leaders on diversity, equity, and inclusion both internally and in the communities we impact*.

●     Invest in science, technology, engineering, and mathematics (STEM) education to *increase the pipeline of diverse technology talent, globally*.[10]

81.     The Company's website also states:

---

[9]*See* https://www.nortonlifelock.com/us/en/corporate-responsibility/diversity-and-inclusion/, last visited July 21, 2020.

[10] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

**At NortonLifeLock we are committed to supporting our employees through our Business Impact Communities (BIC) program. BICs play a vital role in helping create an inclusive work culture where everyone feels seen, heard, respected, and valued. Where everyone feels like they belong. Our belief is that when you give people equal opportunity, amazing things happen.**

● Assist the company with the recruitment and onboarding of underrepresented talent.

● Identify opportunities to improve the retention and advancement of underrepresented employees.

● Host networking, educational, and engagement opportunities to help build cross-cultural awareness and career advancement skills.[11]

82. The Individual Defendants have also caused NortonLifeLock to represent that the Company has taken active and concerted steps to recruit African American individuals:

We believe that a diverse and inclusive work environment helps us understand our customers better, enables us to respond to new trends more rapidly, and stimulates innovation. Investing in diversity is a business imperative and our support of Net Impact has helped establish undergraduate chapters at Historically Black Colleges and Universities (HBCUs) and helped create the Racial Equity Fellowship.[12]

83. In the Company's 2019 Corporate Responsibility Report, the Company stated that the following issues were priorities:

**Priority Issues**:

**Information Security and Privacy**: Protection of Symantec, customer, and employee data; appropriate use of data and technology.

[11] *Id.*

[12] *See* https://www.nortonlifelock.com/blogs/corporate-responsibility/netimpact, last visited July 21, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

**Culture and Inclusion**: Employee satisfaction; cultivation of an inclusive work environment.

**Talent and Diversity**: Recruiting and retaining top talent; career development; employee, management, ***and Board diversity***.[13]

84.     The Report also stated that:

We are one year into our two-year diversity and inclusion roadmap strategy, and we are proud of our progress. This roadmap includes a corporate-wide plan to drive greater diversity within job roles and to invest more in developing diverse talent.[14]

85.     NortonLifeLock stated in the Report that one of its major initiatives to try to increase diversity in its workforce was to use "gender neutral" job descriptions:

[The Company] is dedicated to building a diverse and inclusive workforce centered on our core values and a shared commitment to excellence. We've made investing in talent and diversity a priority because it translates into a higher performing company. To that end, we are amplifying cultural values and implementing diverse and inclusive practices throughout the organization.

**Emphasizing diversity in our talent strategy**
***In order to gain access to a more diverse slate of candidates***, we knew we needed to move beyond traditional hiring strategies. In FY19, ***we worked towards developing gender-neutral job descriptions with phrases and wording to attract a wider pool of diverse candidates***.

86.     Using "gender neutral" job descriptions may encourage more women to apply for certain jobs, but it does nothing to increase the number of African Americans

---

[13]Available at file:///C:/Users/fbottini/Downloads/2019-corporate-responsibility-report-en%20(2).pdf, last visited July 21, 2020.

[14] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

and minorities at the Company.   The fact that NortonLifeLock trumpets the use of gender-neutral job descriptions as a "major initiative" reveals how far the Company has to go with respect to increasing true diversity at NortonLifeLock.

87.    The failure of NortonLifeLock to increase the percentage of African Americans at the Company was disclosed in the 2019 Corporate Responsibility Report, which stated that:

### U.S. Ethnic Diversity

Total U.S. Jobs
White:       58%
Asian:       33%
Hispanic:   5%
**Black:     2%**

Leadership Jobs
White:       66%
Asian:       27%
Hispanic:   5%
**Black:     1%**

**B.    The Nominating and Governance Committee is Responsible for Nominating Individuals to the Company's Board**

88.    In 2019 and 2020, Directors Mahoney, Dangeard, Feld, Fuller & Schulman served on NortonLifeLock's Nominating & Governance Committee.

89.    As set forth in the Company's 2019 Proxy Statement, the Committee is responsible for the following duties, among others:

Our Nominating and Governance Committee is currently comprised of Mr. Mahoney, who is the chair of the Nominating and Governance Committee, and Messrs. Dangeard, Feld, Fuller and Schulman. Our Nominating and Governance Committee oversees our Company's corporate governance procedures and policies, and ensures that they represent best practices and are in the best interests of our Company and its stockholders, which includes establishing appropriate criteria for nominating qualified candidates to the Board. Its duties and responsibilities include, among

28

SHAREHOLDER DERIVATIVE COMPLAINT

other things:

- *Establishing the criteria and determining the desired qualifications, expertise and characteristics of the Board, with the goal of developing a diversity of perspectives, backgrounds, experiences, knowledge and skills on the Board.*

- Considering the size, composition and needs of the Board and *evaluate and recommending qualified candidates for election to the Board* consistent with the established criteria to ensure the Board has the appropriate skills and expertise.

- *Advising the Board on corporate governance matters* and recommend to the Board appropriate or necessary actions to be taken by our Company, the Board and the Board's committees.

- *Identifying best corporate governance practices* and develop and recommend to the Board a set of corporate governance guidelines applicable to our Company.

- *Reviewing and assessing the adequacy of our Company's corporate governance policies, including our Company's Corporate Governance Guidelines* and Code of Conduct, and recommend modifications to the Board as appropriate.

- Overseeing and reviewing our Company's policies and programs concerning: (i) corporate social responsibility; (ii) public policy; (iii) philanthropy; (iv) political activities and expenditures; (v) our Company's participation and visibility as a global corporate citizen; and (vi) our Company's sustainability performance, including impacts to our business of environmental, social and governance issues.

- Monitoring compliance under the stock ownership guidelines as set by the Compensation Committee for the Board and executive officers.

- *Implementing and overseeing the processes for evaluating the Board, its committees and the CEO on an annual basis.*

- Overseeing the management of risks that may arise in connection with our Company's governance structures and processes.

SHAREHOLDER DERIVATIVE COMPLAINT

90.     Moreover, the 2019 Proxy stated that the members of the Nominating & Governance Committee had actual knowledge about the Company's diversity & inclusion efforts due to regular meetings with management:

*Our Nominating and Governance Committee has regular touchpoints with management on the following topics*:
- Employee engagement and work-life integration initiatives;
- Monitoring our workforce planning, including required capabilities and skills development;
- *Understanding our workforce demographics and diversity, equity and inclusion strategies*; and
- *Monitoring our corporate culture*.

91.     With respect to the nominating process to select individuals to serve on the Company's Board, and the desired characteristics of the Board, the 2019 Proxy stated:

**Diversity.**  In addition to a diverse portfolio of professional background, experiences, knowledge and skills, *the composition of the Board should reflect the benefits of diversity as to gender, race, ethnic, cultural and geographic backgrounds that reflect the composition of our global investors, customers, employees and partners*.[15]

92.     In reality, NortonLifeLock has made no real efforts to promote diversity on its Board and among its senior executives.  Indeed, in the 2019 and 2020 Proxy the word "diversity" only appears seven (7) times.

**C.     At All Relevant Times, the Individual Defendants Have Had Actual Knowledge That, Contrary to Its Public Statements, NortonLifeLock Was Not Achieving Success With Respect to Its Diversity and Inclusion Initiatives**

93.     NortonLifeLock, led by its Board, has consistently refused to appoint Black and minority individuals to the Board and to management positions within the Company.  The Company was called out all the way back in 2013 for its refusal to do so,

---

[15] *See* NortonLifeLock 2019 Proxy Statement at p. 15.

SHAREHOLDER DERIVATIVE COMPLAINT

but has persisted in its intransigence.

94.   And the lack of diversity at the top at NortonLifeLock has resulted in economic discrimination.  The pay of the Company's CEO in fiscal year 2020 was 222 times as high as the median pay of all other employees:

**Pay Ratio**:

- Mr. Pilette's fiscal 2020 annual total compensation was $20,596,491 which was calculated in the same manner as the amounts reported in the "Total" column of the "2020 Summary Compensation Table" in this proxy statement, except that Mr. Pilette's base salary was annualized.

- The fiscal 2020 annual total compensation of our median employee (other than our CEO) was $92,914.

- Based on this information, the pay ratio of the annual total compensation of our CEO to the median of the annual total compensation of our employees is 222.5 to 1.[16]

95.   Instead of acknowledging the problem and demanding change, NortonLifeLock has instead issued false statements claiming success in achieving diversity and inclusion.

96.   Defendants had actual knowledge of the specific requirements regarding diversity that were required by law to be included in the Company's Proxy Statements. After the 2008-2009 stock market crash, the SEC passed a major set of rules mandating additional proxy disclosures regarding the board nomination process.  At an open meeting held on December 16, 2009, the Securities and Exchange Commission ("SEC") approved a set of proposed rules to enhance the information provided to shareholders in company proxy statements.  Significantly, the rules required, among other things,

---

[16] *See* NortonLifeLock 2020 Proxy Statement at p. 74.

SHAREHOLDER DERIVATIVE COMPLAINT

specific disclosures regarding:

> **<u>Diversity Considerations in the Director Nomination Process</u>**.  In the rule proposals, the SEC asked whether it should amend its rules to ***require disclosure of additional factors that a nominating committee considers when selecting someone for a position on the board, such as diversity***, and whether it should amend the rules to ***require additional or different disclosure related to board diversity.  The rules as adopted require disclosure of whether, and if so how, a nominating committee considers diversity in identifying nominees for directors***.[17]

97.     The additional disclosures required in proxy statements regarding the qualifications and nominating process of persons nominated to serve on Board of Directors were necessary because, as the ultimate decision-making body of a company, the Board bears ultimate responsibility for corporate decisions.  Congress and the SEC rightfully determined that shareholders needed additional information about the qualifications of director nominees and the process by which a company's nominating and corporate governance committee identifies and selects persons to serve on corporate boards.

**D.     False and Misleading 2018, 2019, and 2020 Proxy Statements Approved by the Director Defendants**

98.     Notwithstanding their knowledge about NortonLifeLock's failure to promote and achieve diversity and its discriminatory hiring and promotion practices, the Director Defendants caused NortonLifeLock to issue Proxy Statements that were materially misleading.

99.     The Company's 2018 Proxy was filed with the SEC on October 29, 2018 and

---

[17] *See "SEC Adopts Final Rules on Enhanced Proxy Statement Disclosures,"* Harvard Law School Forum on Corporate Governance, Dec. 21, 2009, available at https://corpgov.law.harvard.edu/2009/12/21/sec-adopts-final-rules-on-enhanced-proxy-statement-disclosures/, last visited July 25, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

1  approved by Directors Clark, Dangeard, Feld, Fuller, Hao, Humphrey, Laybourne,

2  Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot.

3      100.    The Company's 2019 Proxy Statement was filed with the SEC on

4  November 7, 2019 and was approved by Defendants Dangeard, Barsamian, Denzel, Feld,

5  Hao, Humphrey, Pilette, and Unruh.  The 2018 and 2019 annual meetings were held in

6  Mountain View, California.

7      101.    The Company's 2020 Proxy Statement was filed with the SEC on July 22,

8  2020 and was approved by Defendants Dangeard, Barsamian, Denzel, Feld, Hao,

9  Humphrey, Pilette, and Unruh.

10      102.    In the 2018, 2019, and 2020 Proxy Statements, the Company stated that:

11  **Diversity**.    In addition to a diverse portfolio of professional background,
   experiences, knowledge and skills, *the composition of the Board should*
12  *reflect the benefits of diversity as to gender, race, and ethnic background*.[18]

13      103.    The 2020 Proxy similarly stated:

14  **Diversity**.    In addition to a diverse portfolio of professional background,
   experiences, knowledge and skills, *the composition of the Board should*
15  *reflect the benefits of diversity as to gender, race, ethnic cultural and*
16  *geographic backgrounds that reflect the composition of our global*
   *investors, customers, employees and partners*.[19]
17

18      104.    In the 2019 Proxy, the Directors admitted that the Company does not even

19  have a written policy regarding diversity of Board candidates:

20  *[W]e do not have a formal written policy with regard to the consideration*
   *of diversity in identifying candidates*; however, as discussed above,
21  diversity is one of the numerous criteria the Nominating and Governance
   Committee reviews before recommending a candidate.
22

23      105.    The 2018 and 2020 Proxy Statements contained an identical statement:

24  

25  [18] 2018 Proxy at p. 17; 2019 Proxy at p. 15.

26  [19] 2020 Proxy at p. 15.

27  

28  

SHAREHOLDER DERIVATIVE COMPLAINT

"In addition, we do not have a formal written policy with regard to the consideration of diversity in identifying candidates; however, as discussed above, ***diversity is one of the numerous criteria the Nominating and Governance Committee reviews before recommending a candidate***."[20]

106.    These statements were misleading.    While acknowledging that the Company "do[es] not have a formal written policy with regard to the consideration of diversity in identifying candidates," the Proxy nonetheless represented that "diversity is one of the numerous criteria the Nominating and Governance Committee reviews."  The statement misled shareholders into believing that the Board considers diversity an important factor in deciding which candidates to nominate for Board seats.  In reality, it is not an important factor and the Company is not committed to racial and ethnical diversity on the Board and among the Company's senior executives.

107.    These statements in the 2018, 2019, and 2020 Proxy Statements were also misleading because they suggested that the Governance Committee has a goal of achieving diversity on the Board by seeking to achieve representation of diverse persons – *i.e.*, Blacks and other minorities.  In reality, however, the Governance Committee does not have a goal of increasing the racial diversity of applicants for Board seats and instead only has a goal of placating the Company's activist investors such as Starboard and those investors providing the Company with financing such as Silver Lake.

108.    The 2018, 2019, and 2020 Proxy Statements were also misleading because they suggested that the Company was actively seeking to achieve racial and ethnic diversity in its Board membership.  Despite stating that the Nominating and Governance Committee reviews diversity before recommending candidates to the Board, the fact remains that NortonLifeLock has no African Americans on its Board, and that no African American or other minority candidate has been elected to the NortonLifeLock Board in

---

[20] *See* 2018 Proxy Statement at p. 18; 2020 Proxy at p. 16.

SHAREHOLDER DERIVATIVE COMPLAINT

1  the last four years, and that Hao, who was nominated to the Board in 2016, was not

2  nominated in order to attempt to promote diversity but instead due to a deal the

3  Company made with Silver Lake as part of Silver Lake's investment in the Company.

4  The undisclosed truth therefore is that NortonLifeLock has no intention to actually

5  nominate African Americans or other minorities to its Board.

6      109.   The false, misleading, and omitted information about diversity was highly

7  material, and is required by SEC rules governing proxy statements.  In passing the 2009

8  rule, the SEC stated:

9           In the Proposing Release, we also requested comment on whether we
10          should amend our rules to require disclosure of additional factors
            considered by a nominating committee when selecting someone for a
11          board position, such as board diversity. A significant number of
            commenters responded that disclosure about board diversity was
12          important information to investors.[21] Many of these commenters believed
13          that requiring this disclosure would provide investors with information on
            corporate culture and governance practices that would enable investors to
14          make more informed voting and investment decisions.[22] Commenters also
15          noted that there appears to be a meaningful relationship between diverse
            boards and improved corporate financial performance, and that diverse
16          boards can help companies more effectively recruit talent and retain staff.[23]
17          ***We agree that it is useful for investors to understand how the board
18          considers and addresses diversity, as well as the board's assessment of the***

19      _____

20          [21] *See, e.g.,* letters from Board of Directors Network, Boston Common Asset
        Management, CalPERS, CalSTRS, Calvert, Council of Urban Professionals, Ernst &
21      Young LLP ("E&Y"), Greenlining Institute, Hispanic Association on Corporate
        Responsibility, Interfaith Center on Corporate Responsibility, InterOrganization
        Network, Latino Business Chamber of Greater Los Angeles, Pax World Management
22      Corporation, Prout Group, Inc., RiskMetrics, Sisters of Charity BVM, Sisters of St. Joseph
        Carondelet, and Trillium Asset Management Corporation.

23          [22] *See, e.g.,* letters from the Boston Club, Boston Common Asset Management,
        CalPERS, Pax World Management Corporation, Trillium Asset Management
24      Corporation, and Social Investment Forum.

25          [23] *See, e.g.,* letters from Catalyst and the Social Investment Forum.

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6

*implementation of its diversity policy, if any. Consequently, we are adopting amendments to Item 407(c) of Regulation S-K to require disclosure of whether, and if so how, a nominating committee considers diversity in identifying nominees for director*.[24] In addition, if the nominating committee (or the board) has a policy with regard to the consideration of diversity in identifying director nominees, disclosure would be required of how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of its policy.[25]

7

8

110.    In further expanding on the importance and materiality to investors of the new diversity disclosures mandated by the 2009 rule, the SEC stated:

9
10
11
12
13
14
15
16
17
18
19

Required disclosure of whether, and if so, how a nominating committee (or the board) considers diversity in connection with identifying and evaluating persons for consideration as nominees for a position on the board of directors may also benefit investors. *Board diversity policy is an important factor in the voting decisions of some investors.*[26] *Such investors will directly benefit from diversity policy disclosure* to the extent the policy and the manner in which it is implemented is not otherwise clear from observing past and current board selections. Although the amendments are not intended to steer behavior, *diversity policy disclosure may also induce beneficial changes in board composition*. A board may determine, in connection with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity. Such a policy may encourage boards to conduct broader director searches, evaluating a wider range of candidates and potentially improving board quality. *To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the*

20
21
22

[24] *See* Item 407(c)(2)(vi) of Regulation S-K. Funds will be subject to the diversity disclosure requirement of Item 407(c)(2)(vi) of Regulation S-K under Item 22(b)(15)(ii)(A) of Schedule 14A. See 17 CFR 240.14a-101, Item 22(b)(15)(ii)(A).

23
24

[25] *See* United States Securities & Exchange Commission, Release Nos. 33-9089; 34-61175; IC-29092; File No. S7-13-09, Dec. 16, 2009, available at https://www.sec.gov/rules/final/2009/33-9089.pdf, last visited July 25, 2020.

25
26

[26] *See, e.g.,* letters from Calvert, Trillium, Boston Common Asset Management, CII, Florida State Board of Administration, and Sisters of Charity BVM. *See also* letter from Lissa Lamkin Broome and Thomas Lee Hazen.

27
28

SHAREHOLDER DERIVATIVE COMPLAINT

*board or management and are, consequently, more independent. To the extent that a more independent board is desirable at a particular company, the resulting increase in board independence could potentially improve governance*.  In addition, in some companies a policy of increasing board diversity may also improve the board's decision making process by encouraging consideration of a broader range of views.[27]

111.    As a result of the 2009 rule enacted by the SEC, Item 407 of Regulation S-K now requires all companies in their proxy statements to:

Describe the nominating committee's process for identifying and evaluating nominees for director, including nominees recommended by security holders, and any differences in the manner in which the nominating committee evaluates nominees for director based on whether the nominee is recommended by a security holder, and whether, and if so how, the nominating committee (or the board) considers diversity in identifying nominees for director. If the nominating committee (or the board) has a policy with regard to the consideration of diversity in identifying director nominees, describe how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of its policy.[28]

112.    The Nominating & Governance Committee at NortonLifeLock is responsible for nominating candidates to the Board.  The Company's 2019 Proxy stated that:

The Nominating and Governance Committee will consider candidates submitted by NortonLifeLock stockholders, as well as candidates recommended by directors and management, for nomination to the Board. The Nominating and Governance Committee has generally identified nominees based upon recommendations by outside directors, management and executive recruiting firms. The goal of the Nominating and Governance Committee is to assemble a Board that offers a diverse portfolio of perspectives, backgrounds, experiences, knowledge and skills derived from high-quality business and professional experience. The

---

[27] *Id.*

[28] *See* Item 407(c)(2)(vi) of Regulation S-K, 17 CFR §229.407.

SHAREHOLDER DERIVATIVE COMPLAINT

Nominating and Governance Committee annually reviews the appropriate skills and characteristics required of directors in the context of the current composition of the Board, our operating requirements and the long-term interests of our stockholders.[29]

113.    The 2020 Proxy Statement stated:

The Nominating and Governance Committee will consider potential nominees properly submitted by stockholders. Stockholders seeking to do so should provide the information set forth in our corporate Bylaws regarding director nominations. The Nominating and Governance Committee will apply the same criteria for candidates proposed by stockholders as it does for candidates proposed by management or other directors.[30]

114.    At NortonLifeLock, one of the ways the Company has inhibited and prevented diverse candidates from being nominated to serve on the Board is through restrictive and unreasonable provisions that place a high bar on shareholders' ability to nominate candidates other than the incumbent directors.  As admitted in the 2020 Proxy:

Our Bylaws contain "proxy access" provisions which permit a stockholder, or a group of up to 50 stockholders, owning continuously for at least three years a number of shares of our common stock that constitutes at least 3% of our outstanding shares of common stock, to nominate and include in our proxy materials director nominees constituting up to the greater of two individuals or 20% of the Board, provided that the stockholder(s) and the nominee(s) satisfy the requirements specified in the Bylaws.[31]

115.    As this statement indicates, any NortonLifeLock shareholder wanting to nominate a new individual to the Board – for example, an African American individual – has to own 3% of the Company's stock, or alternatively somehow get in contact with and

---

[29] *See* 2019 Proxy at p. 15.
[30] See 2020 Proxy at p. 16.
[31] *See* 2020 Proxy at p. 7.

SHAREHOLDER DERIVATIVE COMPLAINT

convince 49 other shareholders who collectively own 3% of the Company's stock to agree to nominate the individual.  The Company's 2020 Annual Report disclosed that "The number of shares of NortonLifeLock common stock, $0.01 par value per share, outstanding as of May 12, 2020 was 589,028,713 shares."   Thus, 3% of NortonLifeLock's shares equates to 17,670,861 shares.

116.    At NortonLifeLock's current stock price of approximately $21.00,[32] a shareholder would have to own $371,088,081 in NortonLifeLock stock in order to have the right to nominate an African American individual to NortonLifeLock's Board.  No wonder there are no Blacks on NortonLifeLock's Board.

117.    But the restrictions do not end there.  In addition to having to own 3% of NortonLifeLock's stock, a shareholder has to have owned the stock "continuously for at least the last three years."  So, there is a three-year waiting period even after a person buys NortonLifeLock stock in order to be able to nominate a director to the Board.

118.    NortonLifeLock's Proxy Statement was also materially misleading because it contained material omissions: it failed to disclose that the purpose and effect of its "proxy access" rules, in combination with the policies of its Nominating & Governance Committee, was to inhibit the nomination and election of Blacks and minorities to the Board.  These material omissions would have been material to a shareholder's decision as to whether to re-elect the incumbent directors at the annual meeting.  In the 2018, 2019, and 2020 Proxy Statements, the reelection of the incumbent directors was Item No. 1.  For example, in the 2020 Proxy, with respect to the election, the Board asked shareholders to vote in favor, stating:

---

[32] As of July 23, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

At the recommendation of the Nominating and Governance Committee, the Board has nominated the following eight persons to serve as directors for the term beginning at the Annual Meeting on September 8, 2020: Sue Barsamian, Eric K. Brandt, Frank E. Dangeard, Nora M. Denzel, Peter A. Feld, Kenneth Y. Hao, David W. Humphrey and Vincent Pilette. Each director will be elected on an annual basis.

Eric K. Brandt, a director who was appointed in February 2020, was recommended by the Nominating and Governance Committee after an extensive and careful search was conducted by the Committee and numerous candidates were considered. Mr. V. Paul Unruh, a member of our Board of Directors since 2005, is not standing for re-election at the Annual Meeting. The Board thanks Mr. Unruh for his leadership and years of service to NortonLifeLock.

**THE BOARD RECOMMENDS A VOTE "FOR" THE ELECTION OF EACH OF THE EIGHT NOMINATED DIRECTORS**.[33]

119.    In the 2018 Proxy, the nominated directors were Clark, Dangeard, Feld, Fuller, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot.

120.    In the 2019 Proxy, the nominated directors were Sue Barsamian, Frank E. Dangeard, Nora M. Denzel, Peter A. Feld, Kenneth Y. Hao, David W. Humphrey, Paul Unruh, and Vincent Pilette.

121.    The Proxy Statements were also materially misleading because they failed to disclose that the Company does not have term limits, and that the purpose of the lack of term limits is to entrench the current directors in office and prevent African Americans and minorities from having fair opportunities to be elected to the Board.

122.    To attempt to justify its racism, NortonLifeLock's Board has resisted efforts to appoint new members to its Board by claiming that the individuals who have served on the Board for, in some cases more than a decade, have experience that is valuable to

---

[33] *See* 2020 Proxy at pp. 18- 29.

40

SHAREHOLDER DERIVATIVE COMPLAINT

the Company. The Proxy was false and misleading for failing to disclose the lack of term limits and the true reasons and effect of the lack of term limits.

123.    In reality, longer-tenured directors do not serve the best interests of the Company, as amply demonstrated by leading academics and professionals in the field of best corporate governance principles. A report by the Harvard Law School Forum on Corporate Governance noted that:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors*** (***one-third of whom each own or manage assets in excess of $100 billion***) ***who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic***. Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.[34]

124.    The Director Defendants' refusal to adopt director term limits and to appoint new Black and minority members to the Board represents explicit or implicit racism at NortonLifeLock, and an improper pretext for failing to add Black and minority individuals to the Board.   By falsely asserting that term limits would deprive NortonLifeLock of the "experience" of older white members who have served on the Board for more than a decade, the Director Defendants made intentionally or recklessly false statements in order to get themselves reelected and to conceal the true reasons for NortonLifeLock's long-standing failure to add African Americans to its Board.

---

[34]   *Available at* https://corpgov.law.harvard.edu/2017/02/09/board-refreshment-trends-at-sp-1500-firms/ (last visited June 21, 2020).

SHAREHOLDER DERIVATIVE COMPLAINT

125.    The 2018, 2019, and 2020 Proxy Statements were also materially misleading because they asked shareholders to vote in favor of executive compensation "say on pay" proposals, but failed to disclose that none of NortonLifeLock's executive compensation decisions take into consideration whether the executives have been successful in achieving the Company's critical diversity and inclusion goals.

126.    For example, the 2019 Proxy stated:

In executive session without our CEO or other executive officers present, the Compensation Committee approved our CEO's and other executive officers' fiscal 2018 equity award amounts, the fiscal 2018 ACIP earned amounts, and any adjustments to base salaries and ACIP targets for fiscal 2019. In making these decisions, and in determining the amounts and mix of executive compensation, the Compensation Committee considered the following factors, among others:

•    Feedback from other Board members regarding the leadership contributions of our CEO and other executive officers to our annual and long-term performance;

•    Feedback from the Compensation Committee members;

•    Our business performance;

•    Feedback from our CEO regarding our business performance, his performance and his evaluation of and compensation recommendations for the other executive officers;

•    The executive officers' individual performance and contributions to financial and strategic objectives, including expertise, skills and tenure in position;

•    Labor market conditions and the executive officers' potential to assume increased responsibilities;

•    Operational management, such as project milestones, process improvements and expense management;

•    Internal working and reporting relationships and teamwork among our executive officers (for example, using the same ACIP financial metrics and objectives for all executive officers promotes teamwork and collaboration and our executive officers' contribution to Company-wide initiatives);

•    The Compensation Committee's intention for compensation to be internally fair and equitable relative to roles, responsibilities and relationships, in addition to being competitively reasonable;

SHAREHOLDER DERIVATIVE COMPLAINT

- *Developing and motivating employees* (such as establishing processes for identifying and assessing high potential employees) and *attracting and retaining employees (such as initiatives to increase the pipeline of women in leadership roles)*; and

- *Leadership actions that support our ethical standards and compliance culture*.

127.    The 2020 Proxy had an almost identical statement with respect to the factors considered by NortonLifeLock's Compensation Committee when determining executive compensation:

> In executive session without our CEO or other executive officers present, the HR and Compensation Committee approved the fiscal 2019 equity award amounts, the fiscal 2019 ACIP earned amounts and any adjustments to base salaries and ACIP targets for fiscal 2020. In making these decisions and determining the amounts and mix of executive compensation, the HR and Compensation Committee considered the following factors, among others:

> • Labor market conditions, competitive compensation for comparable positions and threats to our business due to retention-related risks.

> • Business performance including operational management such as project milestones, process improvements and expense management.

> • Feedback from our CEO regarding the performance of our business, his performance and his evaluation of and compensation recommendations for the other executive officers.

> • *The executive officers'* individual performance and *contributions to* financial and *strategic objectives*, including expertise, skills, tenure in position and potential to assume increased responsibilities.

> • Internal working and reporting relationships and teamwork among our executive officers (for example, using the same ACIP financial metrics and objectives for all executive officers promotes teamwork and collaboration and our executive officers' contribution to Company-wide initiatives).

43

SHAREHOLDER DERIVATIVE COMPLAINT

- The HR and Compensation Committee's intention for compensation to be internally fair and equitable relative to roles, responsibilities and relationships, in addition to being competitively reasonable.

- *Leadership actions that support our ethical standards and compliance culture*.

- *Developing and motivating employees (such as establishing processes for identifying and assessing high potential employees) and attracting and retaining employees (such as initiatives to increase the pipeline of women in leadership roles)*.

128.    These statements about executive compensation were false and misleading. The statements suggested that executive compensation took into consideration "leadership actions that support our ethical standards and *compliance culture*" and efforts towards increasing diversity and increasing the pipeline of women in leadership roles.  In reality, those kinds of salutary and important goals do not count for any kind of significant weighting towards the amount of compensation that gets awarded to executives at NortonLifeLock.   In fact, at NortonLifeLock over 90% of executive compensation is based on the Company's financial performance.

129.    These omitted facts, had they been disclosed, would have been highly material to stockholders' decisions as to whether to reelect the Board nominees and vote in favor or against the "say on pay" executive compensation proposals.  Diversity and inclusion are valued very highly by shareholders, including Plaintiff, and the omitted fact that NortonLifeLock does not include any significant weight (if any) to executives' success or lack thereof in achieving the Company's diversity goals would have been very important to shareholders' voting deliberations.

130.    The false statements and material omissions in the Proxy Statements had their desired effect.   At NortonLifeLock's annual meetings in 2018 2019, all the

44

SHAREHOLDER DERIVATIVE COMPLAINT

1   incumbent white directors were reelected.  No competing Black or minority candidates

2   made it on the ballot or were elected.  The executive compensation "say on pay"

3   proposals were approved.  PWC was reappointed as the Company's auditor.[35]

4        131.    The 2018, 2019, and 2020 Proxy Statements were false and misleading

5   because they omitted and failed to disclose:

6        (a)    That the statement in the Proxies that "diversity is one of the

7   numerous criteria the Nominating and Governance Committee reviews

8   before recommending a candidate" was misleading because it suggested

9   that the Company was actively seeking to achieve racial and ethnic

10   diversity in its Board membership, while the undisclosed reality is that

11   NortonLifeLock either has no intention to actually nominate such persons

12   to its Board or it engages in efforts to thwart the nomination of such

13   persons and prefers non-diverse applicants in the pool;

14        (b)    That the Company does not have term limits due to a desire

15   to retain the experience of the incumbent Director Defendants, but instead

16   to keep minorities off the Board;

17        (c)    That the Company's failure to disclose its median salary and

18   pay/employment data in an annual report is due to a desire to conceal

19   existing, known pay disparity at the Company which adversely affects

20   women and minorities;

21        (d)    That the Company's executive compensation decisions do not

22   take into consideration in any way the executives' success or lack thereof in

23   achieving the Company's diversity and inclusion goals; moreover, that the

24

25   [35] The 2020 Annual Meeting had not yet occurred at the time this complaint was
filed.

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with;

(e)     That the Board's Nominating and Governance Committee did not take racial and ethnic diversity into consideration when nominating Board candidates and instead simply sought to create a false appearance of seeking diversity among potential Board candidates;

(f)     That Defendants had knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access;

(g)     That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to diversity and inclusion were being complied with;

(h)   That the statement in the Proxies that "the composition of the Board should reflect the benefits of diversity as to gender, race, ethnic, cultural and geographic backgrounds that reflect the composition of our global investors, customers, employees and partners" was misleading in that it failed to disclose that the Board composition did not in fact reflect the gender, race, ethnic, cultural, and geographic backgrounds reflective of the composition of the Company's investors, customers, employees and partners; and

(i)     That the Company's diversity and inclusion programs were not achieving measurable and actionable results, and needed substantial improvement.

132.    The 2018, 2019 and 2020 Proxy Statements harmed the Company by interfering with the proper governance on its behalf that requires stockholders' informed voting of directors. As a result of the false or misleading statements in the Proxies,

SHAREHOLDER DERIVATIVE COMPLAINT

1    stockholders voted to reelect all of the Defendants to the Board in 2018 and 2019.

2        133.    The statements in the 2018, 2019, and 2020 Proxy Statements conveyed that

3    the Company's corporate governance structure was "effective" and provided "oversight

4    of management and Board accountability."    In reality, the Company's corporate

5    governance structure and defective internal controls allowed senior executives and the

6    Board to sidestep real accountability and instead continue perpetuating the

7    discriminatory practices in hiring practices, and lack of diversity on both the Board and

8    management.

9        134.    The 2018 and 2019 Proxies, which contained materially misleading

10   statements and thus deprived shareholders of adequate information necessary to make a

11   reasonably informed decision, caused the Company's stockholders to reelect all of the

12   Defendants to the Board and approve executive compensation proposals while the

13   Defendants were breaching their fiduciary duties to the Company and deliberately

14   concealing material information concerning the Company's discrimination against Black

15   and other minority individuals and its effects on the Company's business and

16   reputation.

17       **E.    NortonLifeLock's Nominating and Governance Committee Members
18           Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity
             on the Board**

19       135.    The Charter of the Nominating and Governance Committee sets forth the

20   duties of the Board members serving on such committee.   Among those duties, with

21   respect to the nomination of candidates to serve on NortonLifeLock's Board, are the

22   following:

23       ***Board Composition, Nomination and Evaluation***

24       1.     ***Establish the criteria and determine the desired
25   qualifications, expertise and characteristics of the Board, with the <u>goal of
     developing a diversity of background and experience on the Board</u>.***

26       2.     ***Consider and recruit qualified candidates***, in consultation
27   with the Company's Chairman and Chief Executive Officer and after

28

SHAREHOLDER DERIVATIVE COMPLAINT

taking into account input from the Board's ongoing succession planning process, for membership on the Board.

    3.    Consider the size, composition and needs of the Board and ***evaluate and recommend qualified candidates for election to the Board*** consistent with the established criteria to ensure the Board has the appropriate skills and expertise. The Committee shall recommend to the Board each year the director nominees for election at the next annual meeting of stockholders. Upon the recommendation of the Committee, the Board may appoint a director to the Board during the course of the year to serve until the next annual meeting of stockholders.

    ***4.    Evaluate and make recommendations to the Board regarding the structure and operations, size, and composition of the Board*** committees, committee member qualifications, committee member appointment and removal, and committee reporting to the Board.[36]

136.    The 2020 Proxy also stated the following with respect to the Nominating and Governance Committee responsibilities:

**Process for Identifying and Evaluating Nominees**

    The Nominating and Governance Committee typically considers candidates by first evaluating the current members of the Board who intend to continue in service, balancing the value of continuity of service with that of obtaining new perspectives, skills and experience. If the Nominating and Governance Committee determines that an opening exists, it identifies the desired skills and experience of a new nominee, including the need to satisfy rules of the SEC and Nasdaq.

    The Nominating and Governance Committee generally will evaluate each candidate based on the extent to which the candidate contributes to the range of talent, skill and expertise appropriate for the Board generally, as well as the candidates.

---

[36] *See https://s24.q4cdn.com/151081985/files/doc_corporate_governance/committee/2020/02/NLOK-NGC-Charter-(02.03.20).pdf* , last visited July 23, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

137.    The members of the Nominating and Governance Committee (Mahoney, Dangeard, Feld, Fuller and Schulman) have breached their fiduciary duties as directors by failing to fulfill these duties.  Rather than causing NortonLifeLock to comply with its corporate governance principles, Mahoney, Dangeard, Feld, Fuller and Schulman have caused NortonLifeLock to merely pay lip service to these principles.  Instead of recommending well-qualified black and minority candidates to serve on NortonLifeLock's Board, Mahoney, Dangeard, Feld, Fuller and Schulman have perpetuated the all-white Board under the pretext that the existing members' "experience" and long tenure on the Board is beneficial to NortonLifeLock.

138.    Moreover, to entrench themselves and their fellow directors in office, all the Director Defendants have opposed term limits in order to prevent the addition of qualified African Americans and other minorities to the Board.

139.    As the saying goes, the rich get richer while the poor get poorer.  Serving on NortonLifeLock's Board has enriched the already-rich elites whose profitable sinecure has been perpetuated by the Defendants' wrongdoing.  Many qualified Black and minority candidates would enjoy the prestige and compensation that comes with a position on NortonLifeLock's Board.  The following chart sets forth the compensation earned by outside directors on NortonLifeLock's Board in 2020:

### Fiscal 2020 Director Compensation

| Name | Fees Earned or Paid in Cash ($)[1][2] | Stock Awards ($)[3][4] | Total ($) |
| --- | --- | --- | --- |
| Susan P. Barsamian[5][6] | 119,659 | 324,993 | 444,652 |
| Eric K. Brandt[7] | 2,120 | 34,147 | 36,267 |
| Frank E. Dangeard[8] | 121,636 | 274,994 | 396,630 |
| Nora Denzel[9] | 22,618 | 79,309 | 101,927 |
| Peter A. Feld[5] | 55,007 | 324,993 | 380,000 |
| Dale Fuller* | 85,006 | 274,994 | 360,000 |
| Kenneth Y. Hao[5] | 7 | 324,993 | 325,000 |
| Richard S. Hill[10] | 2,243 | 35,883 | 38,126 |
| David W. Humphrey[5] | 7 | 324,993 | 325,000 |
| David L. Mahoney* | 95,006 | 274,994 | 370,000 |
| Anita Sands* | 70,006 | 274,994 | 345,000 |

49

| | | |
|---|---|---|
| Daniel H. Schulman* | 140,006 | 274,994 | 415,000 |
| V. Paul Unruh* | 95,006 | 274,994 | 370,000 |
| Suzanne M. Vautrinot* | 70,006 | 274,994 | 345,000 |

140.    The following table sets forth the compensation paid to the Company's directors in fiscal year 2019:

**Fiscal 2019 Director Compensation**

| Name | Fees Earned or Paid in Cash ($)(1)(2) | Stock Awards ($)(3)(4) | Total ($) |
|---|---|---|---|
| Susan P. Barsamian(5) | 3,383 | 73,210(6) | 76,593 |
| Frank E. Dangeard | 85,018 | 274,982 | 360,000 |
| Peter A. Feld(7) | 16,071 | 174,108(8) | 190,179 |
| Dale L. Fuller(7) | 34,821 | 147,321 | 182,142 |
| Kenneth Y. Hao | 21 | 324,979(9) | 325,000 |
| Richard S. Hill(5) | 15,772 | 61,948 | 77,720 |
| David W. Humphrey | 21 | 324,979(9) | 325,000 |
| Geraldine B. Laybourne(10) | 80,018 | 274,982 | 355,000 |
| David L. Mahoney | 105,024 | 274,976 | 380,000 |
| Robert S. Miller(10)(11) | 120,639 | 124,635 | 245,274 |
| Anita M. Sands | 70,018 | 274,982 | 345,000 |
| Daniel H. Schulman | 195,018 | 274,982 | 470,000 |
| V. Paul Unruh | 95,018 | 274,982 | 370,000 |
| Suzanne M. Vautrinot | 70,018 | 274,982 | 345,000 |

141.    In addition to awarding themselves substantial compensation for serving on the Board, the Director Defendants lavished the Company's executives with the following compensation in fiscal year 2020:

**Summary Compensation Table for Fiscal 2020**

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($)(1) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($)(2) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| *Continuing NEOs:* | | | | | | | | |
| Vincent Pilette(4) *CEO* | 2020 | 568,750 | — | 19,446,262 | — | 552,500 | 28,979 | 20,596,491 |
| Matthew C. Brown(5) *Former Interim CFO and Current CAO* | 2020 | 330,000 | — | 565,907 | — | 112,200 | 189,617 | 1,197,724 |
| Samir Kapuria(6) *President* | 2020 | 516,667 | — | 5,685,892 | — | 439,167 | 90,643 | 6,732,369 |
| | 2019 | 443,864 | — | 10,311,650 | — | — | 220,667 | 10,976,180 |
| Bryan S. Ko(7) *Chief Legal Officer, Secretary and Head of Corporate Affairs* | 2020 | 123,333 | 1,000,000 | 4,490,760 | — | 82,938 | 4,241 | 5,701,272 |

50

| *Transitioned NEOs:* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Gregory S. Clark(8)(a) | 2020 | 132,925 | — | — | — | — | 180,816 | 313,741 |
| *Former President and CEO* | 2019 | 1,000,000 | — | — | — | — | 1,921,039 | 2,921,038 |
| | 2018 | 1,000,000 | — | 15,982,645 | — | — | 364,936 | 17,347,581 |
| Richard S. Hill(9)(b) | 2020 | 557,780 | — | 1,023,885 | 7,735,000 | 1,076,712 | 392,575 | 10,785,952 |
| *Former Interim President and CEO* | | | | | | | | |
| Nicholas R. Noviello(10)(c) | 2020 | 114,767 | 2,145,417 | 2,092,780 | — | 487,500 | 779,442 | 5,619,907 |
| *Former Executive Vice President and CFO* | 2019 | 650,000 | 1,000,000 | 10,706,470 | — | — | 943,325 | 13,229,795 |
| | 2018 | 650,000 | — | 7,458,549 | — | — | 47,606 | 8,156,155 |
| Amy L. Cappellanti-Wolf(11)(d) | 2020 | 385,000 | — | 4,152,283 | — | 199,867 | 2,640,359 | 7,377,509 |
| *Former Senior Vice President and CHRO* | 2019 | 440,000 | — | 3,462,911 | — | — | 558,163 | 4,461,075 |
| Arthur W. Gilliland(12)(e) | 2020 | 413,636 | — | 7,654,685 | — | 311,321 | 20,209 | 8,399,851 |

142.    The following chart sets forth the compensation that the Director Defendants awarded to the Company's top executives in fiscal year 2019:

### Summary Compensation Table for Fiscal 2019

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($)(1)(2)(3) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Gregory S. Clark | 2019 | 1,000,000 | — | —(5) | — | — | 1,921,039 | 2,921,038 |
| Former President and CEO* | 2018 | 1,000,000 | — | 15,982,645 | — | — | 364,936 | 17,347,581 |
| | 2017 | 666,667 | — | 4,269,815(6) | — | 743,333 | 379,937 | 6,059,752 |
| Nicholas R. Noviello | 2019 | 650,000 | 1,000,000 | 10,706,470(7) | — | — | 943,325 | 13,299,795 |
| Former Executive Vice President and | 2018 | 650,000 | — | 7,458,549 | — | — | 47,606 | 8,156,155 |
| CFO** | 2017 | 433,333 | — | 1,077,917(6) | — | 479,673 | 172,740 | 2,163,663 |
| Amy L. Cappellanti-Wolf | 2019 | 440,000 | — | 3,462,911 | — | — | 558,163 | 4,461,075 |
| Senior Vice President and CHRO | | | | | | | | |
| Samir Kapuria | 2019 | 443,864(8) | — | 10,311,650 | — | — | 220,667 | 10,976,180 |
| President (effective November 8, 2019) | | | | | | | | |
| Scott C. Taylor | 2019 | 600,000 | — | 4,672,177 | — | — | 871,628 | 6,143,804 |
| Executive Vice President, General Counsel | 2018 | 600,000 | — | 4,794,772 | — | — | 621,788 | 6,016,560 |
| and Secretary | 2017 | 600,000 | 150,000 | 4,831,307(6) | — | 568,374 | 363,462 | 6,513,143 |

143.    The Director Defendants lavished the Company's executives with the following compensation in fiscal year 2018:

51

SHAREHOLDER DERIVATIVE COMPLAINT

**Summary Compensation Table for Fiscal 2018**

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards[1][2] ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Gregory S. Clark Chief Executive Officer | 2018 | 1,000,000 | — | 15,982,645 | — | —[3] | 364,936[4] | 17,347,581 |
| | 2017 | 666,667[5] | — | 4,269,815[6] | — | 743,333[7] | 379,937[8] | 6,059,752[6] |
| Nicholas R. Noviello Executive Vice President and CFO | 2018 | 650,000 | — | 7,458,549 | — | —[3] | 47,606[9] | 8,156,155 |
| | 2017 | 433,333[5] | — | 1,077,917[6] | — | 479,673[7] | 172,740[10] | 2,163,663[6] |
| Michael D. Fey President and COO | 2018 | 865,000 | — | 14,917,133 | — | —[3] | 41,832[11] | 15,823,965 |
| | 2017 | 544,167[5] | — | 2,856,660[6] | — | 909,370[7] | 131,000[12] | 4,441,197[6] |
| Scott C. Taylor Executive Vice President, General Counsel and Secretary | 2018 | 600,000 | — | 4,794,772 | — | —[3] | 621,788[13] | 6,016,560 |
| | 2017 | 600,000 | 150,000[14] | 4,831,307 | — | 568,374[7] | 363,462[15] | 6,513,143 |
| | 2016 | 593,939 | — | 3,082,307 | — | 283,380[16] | 86,028[17] | 4,045,654 |
| Francis C. Rosch Former Executive Vice President, Consumer Digital Safety* | 2018 | 700,000 | — | 12,786,109 | — | —[3] | 755,059[18] | 14,241,168 |
| | 2017 | 612,500[19] | — | 6,039,114 | — | 623,970[7] | 461,965[20] | 7,737,549 |
| | 2016 | 504,394 | — | 5,137,221 | — | 320,750[16] | 97,334[21] | 6,059,699 |

144.    These huge salaries to the Company's executives have been awarded by the Compensation Committee Directors (Barsamian, Feld, Mahoney, Schulman and Denzel) while systematically underpaying minorities and women. The Compensation Committee Defendants have consistently awarded massive pay packages to the Company's CEOs which dwarf the median pay of the Company's other employees. The pay of the Company's CEO in fiscal year 2020 was 222 times as high as the median pay of all other employees:

**Pay Ratio**:

- Mr. Pilette's fiscal 2020 annual total compensation was $20,596,491 which was calculated in the same manner as the amounts reported in the "Total" column of the "2020 Summary Compensation Table" in this proxy statement, except that Mr. Pilette's base salary was annualized.

- The fiscal 2020 annual total compensation of our median employee (other than our CEO) was $92,914.

SHAREHOLDER DERIVATIVE COMPLAINT

- Based on this information, *the pay ratio of the annual total compensation of our CEO to the median of the annual total compensation of our employees is 222.5 to 1*.[37]

**F.    The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination**

145.    The Director Defendants have known for years that NortonLifeLock (and its predecessor Symantec) has been violating federal and state laws regarding diversity, equal pay, and discrimination against women and minorities.

146.    Defendants' knowledge is reflected by the fact that, in 2018, the Company was forced to publish its first Gender Pay Gap Report 2018 as a result of legislation passed in England.  While the report only pertained to workers in the Company's UK locations, the Company failed to publish similar figures pertaining to the Company's US operations.

147.    As the Company admitted in the Gender Pay Gap Report 2018, the Company paid women less than men and employed significantly less women than men in senior leadership roles.  The Report stated:

> *A key driver for the gender pay gap at Symantec is due to the lower representation of females in senior, leadership roles*. This is compounded by the overrepresentation of males in sales, engineering, and technical roles. . . *In summary, more men than women are in senior roles receiving a greater level of pay, resulting in a gender pay gap*. Although impact takes time, we are committed to the continuous effort required to ensure that the actions and initiatives detailed in this report create desired change in the future.

148.    The Director Defendants, however, knew that NortonLifeLock had not

---

[37] *See* NortonLifeLock 2020 Proxy Statement at p. 74.

SHAREHOLDER DERIVATIVE COMPLAINT

corrected all the problems with respect to fair and equitable pay to women and minorities and disclosures and best practices regarding pay equity.

149.   The Company's 2019 Corporate Responsibility Report revealed the extent of the problems still persisting at NortonLifeLock, including:

(1)   Only 25% of the Company's workforce is comprised of women;

(2)   Women only hold 23% of the leadership roles at the Company;

(3)   *African Americans only hold 2% of the Company's U.S. jobs;*

(4)   *African Americans only hold 1% of leadership positions at the Company.*

150.   In their efforts to avoid detailed disclosures that would shed light of the true extent of pay inequity at NortonLifeLock afflicting African Americans and minorities, the Director Defendants continue to refuse to publish the unadjusted median gender/racial pay disclosures which are industry best practices and standards.

151.   NortonLifeLock has refused to publish annual diversity reports, thus enabling the Company to attempt to hide the lack of diversity. The Director Defendants were aware of this and were complicit in these acts, thus demonstrating their scienter about NortonLifeLock's failure to ensure diversity and failure to pay minorities equal pay.

**G.   The Unjust Compensation Awarded to Defendants Pilette and Clark**

152.   Defendants Pilette and Clark received unjust compensation and/or compensation and payments that were higher due to Defendants' wrongdoing and because the Company was more profitable by paying women, Blacks and minorities less.

153.   Much of the information about the exact amount of the unjust payments is not publicly available, and has been fraudulently concealed by Defendants. As a result, Plaintiff requires discovery in order to properly allege the full extent and details of Defendants' wrongdoing.

154.   However, at a minimum, based on publicly available information,

54

1    Defendants Clark and Pilette have received substantial unjust compensation during the

2    time the wrongdoing has occurred and persisted.

3         155.    Defendants' receipt of this compensation during the relevant time period

4    was unjust in light of their direct participation in the wrongful conduct alleged herein,

5    which constituted bad faith and disloyal conduct.    Defendants' receipt of such

6    compensation while knowingly or recklessly breaching their fiduciary duties to the

7    Company constitutes unjust compensation that should be recouped by NortonLifeLock.

8         156.    The tables set forth *supra* provide some additional information about some

9    of Defendants' compensation during part of the relevant time period (*i.e.*, 2018-2020).

10        157.    ***In fiscal year 2020, the Company paid its CEO Vincent Pilette total***

11   ***compensation of $20,596,491.  In fiscal year 2018, the Company paid its CEO Gregory***

12   ***Clark total compensation of $17,347,581.  In fiscal year 2019, the Company paid its CFO***

13   ***Nick Noviello $13,299,795 and its President Samir Kapuria $10,976,180***.

14        158.    And the lack of diversity at the top at NortonLifeLock has resulted in

15   economic discrimination.    Defendants' compensation during the relevant period was

16   also unjust because it significantly exceeded the average employees' pay, as disclosed by

17   the Company in its Proxy. The pay of the Company's CEO in fiscal year 2020 was 222

18   times as high as the median pay of all other employees:

19             **Pay Ratio**:

20        •    **Mr. Pilette's fiscal 2020 annual total compensation was**
               **$20,596,491** which was calculated in the same manner as the
21             amounts reported in the "Total" column of the "2020 Summary
               Compensation Table" in this proxy statement, except that Mr.
22             Pilette's base salary was annualized.

23        •    The fiscal 2020 annual total compensation of our median
               employee (other than our CEO) was $92,914.
24
25        •    Based on this information, ***the pay ratio of the annual total***

26

27

28
                                          55

*compensation of our CEO to the median of the annual total compensation of our employees is 222.5 to 1.*[38]

159.    In fiscal year 2018, Defendant Clark's pay ratio was reported as follows in the Proxy:

**Pay Ratio**:

•    **Mr. Clark's fiscal 2018 annual total compensation was $17,347,581**, as reported in the "Total" column of the "2018 Summary Compensation Table" in this proxy statement.

•    The fiscal 2018 annual total compensation of our median employee (other than our CEO) was $102,869.

•    Based on this information, *the pay ratio of the annual total compensation our CEO to the median of the annual total compensation of our employees is 168.6 to 1*.

160.    Instead of acknowledging the problem and demanding change, NortonLifeLock has instead issued false statements claiming success in achieving diversity and inclusion.

161.    If Defendant Clark's and Pilette's 2018 and 2020 pay was more than 225 and 168 times, respectively, the median employees' compensation, then it was an even higher multiple of the median pay of Black and minority employees if NortonLifeLock paid such employees less than other employees for similar jobs.

162.    When viewed in light of these facts, Defendants' compensation was unjust under equitable principles.

163.    Defendants' compensation detailed herein was unjust and should be disgorged or returned by them because they acted in bad faith and in a disloyal manner

---

[38] *See* NortonLifeLock 2020 Proxy Statement at p. 74.

SHAREHOLDER DERIVATIVE COMPLAINT

1 by virtue of the conduct alleged in this complaint.

2 **VIII.   THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES**

3 164.   The Company has suffered significant harm and damages due to
4 Defendants' wrongdoing and breaches of duties.

5 165.   As a direct and proximate result of the Individual Defendants' conduct, the
6 Company has expended and will continue to expend significant sums of money.  Such
7 expenditures include, but are not limited to, the amounts paid to outside lawyers,
8 accountants, and investigators in connection with internal and external investigations
9 into issues pertaining to the lack of diversity at NortonLifeLock, discrimination lawsuits,
10 harassment claims, wrongful termination lawsuits, and lack of pay equity claims.

11 166.   Moreover, NortonLifeLock's reputation, goodwill, and market
12 capitalization have been harmed as a result of the Individual Defendants' misconduct.

13 167.   Further, as a direct and proximate result of the Individual Defendants'
14 actions, NortonLifeLock has expended, and will continue to expend, significant sums of
15 money.  Such expenditures include, but are not limited to:

16 (a)   costs incurred from having to hire new employees, as
17 employees have quit in protest over Defendants' misconduct and the
discriminatory practices employed by NortonLifeLock;

18 (b)   costs incurred from defending and paying settlements in
19 discrimination lawsuits, since the Individual Defendants' wrongdoing
caused discrimination to proliferate at NortonLifeLock;

20 (c)   loss of reputation; and

21 (d)   costs incurred from compensation and benefits paid to the
Individual Defendants who have breached their duties to NortonLifeLock.

22 **IX.   DEMAND FUTILITY**

23 168.   Plaintiff brings this action derivatively in the right and for the benefit of
24 NortonLifeLock to redress injuries suffered, and to be suffered, by NortonLifeLock and
25 its stockholders as a direct result of the Defendants' violations of federal securities laws
26 and breaches of fiduciary duty.

27 169.   NortonLifeLock is named as a nominal defendant solely in a derivative

28

SHAREHOLDER DERIVATIVE COMPLAINT

1   capacity.

2   170.    This is not a collusive action to confer jurisdiction on this Court that it

3   would not otherwise have.

4   171.    At the time this action was commenced, NortonLifeLock's Board consisted

5   of the following 8 members: Defendants Dangeard, Pilette, Feld, Barsamian, Denzel,

6   Brandt, Hao, and Humphrey.[39]

7   172.    Plaintiff has not made any demand on NortonLifeLock to institute this

8   action because such a demand would be a futile, wasteful, and useless act.

9   173.    Under Delaware law, demand is futile if a majority of the directors are

10  either interested in or not independent of a person interested in the claims asserted.

11  Further, where a board is made up of an even number of directors, a majority of

12  directors is considered to be half the Board.    Because NortonLifeLock's Board is

13  currently comprised of eight (8) directors, Plaintiff need only allege that demand is futile

14  as to four (4) of the current Board members.

15  **A.    Demand on the Board is Excused as Futile**

16  174.    The challenged misconduct at the heart of this case involves the direct

17  facilitation of illegal activity, including the Board knowingly and/or consciously

18  presiding over the Company's discrimination against women, Blacks and other

19  minorities at NortonLifeLock.    In their capacity as corporate directors, the Board

20  members affirmatively adopted, implemented, and/or condoned a business strategy

21  based on NortonLifeLock's deliberate and widespread violations of law. The Board

22  members cannot plausibly claim ignorance concerning these wide-ranging compliance

23  failures. Indeed, the Board was specifically and uniquely accountable and responsible

24

25  [39] The Company filed its 2020 Proxy Statement on July 22, 2020, in which it stated
    that Paul Unruh was resigning from the Board and would not stand for re-election.
26

27

28
                                        58
    SHAREHOLDER DERIVATIVE COMPLAINT

for the compliance failures discussed herein given that the Board was repeatedly made aware of the Company's failed internal controls and failure to comply with regulations.

175.    Indeed, the lack of diversity challenged by this lawsuit pertains to the Board itself, which does not contain a single African American individual.    The Company's 2019 Proxy, which was approved by all the directors, stated:

> "**Diversity**.  In addition to a diverse portfolio of professional background, experiences, knowledge and skills, *the composition of the Board should reflect the benefits of diversity as to gender, race, ethnic, cultural and geographic backgrounds that reflect the composition of our global investors, customers, employees and partners*."

176.    Defendants Pilette, Dangeard, Feld, Barsamian, Denzel, Hao, and Humphrey thus all knew that the Company's Board composition was required to reflect the benefits of diversity, including diversity as to race and ethnicity.

177.    Despite having actual knowledge of this requirement, Defendants Pilette, Dangeard, Feld, Barsamian, Denzel, Hao, and Humphrey all knew that, year after year, NortonLifeLock did not choose any racially or ethnically diverse candidates to be Board members.

178.    Rather than undertake their duty to investigate all complaints and concerns related to the Company's financial reporting and internal controls, the Board undertook minimal action. This essential "do nothing" strategy in the face of information evidencing the systematic violations of applicable laws and regulations is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. A derivative claim to recoup damages for harm caused to the Company by pervasive unlawful activity represents a challenge to conduct that is outside the scope of appropriate business judgment – conduct for which the Individual Defendants should face potential personal liability. As such, the protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever involve the "good faith" exercise of directorial authority. Accordingly, any demand on the Board to initiate this action would be futile.

59

**B.     Demand Is Excused Because a Majority of the Director Defendants is Either Not Independent or is Conflicted Because These Defendants Face a Substantial Likelihood of Liability Arising From Their Misconduct**

179.    Even if knowingly presiding over illegal conduct somehow falls within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the members of the Board are not disinterested or independent and cannot, therefore, properly consider any demand.

180.    As an initial matter, the Board has conceded in the Company's SEC filings, including its July 22, 2020 proxy statement, that Pilette is not an independent director of the Company. Specifically, Pilette is not independent and faces a substantial likelihood of liability because his principal occupation is serving as the Company's Chief Executive Officer.  Moreover, a significant portion of Pilette's compensation is incentive-based, which means that he was personally incentivized to perpetuate misconduct (such as that described herein) that artificially inflates the performance of the Company. As a NortonLifeLock executive, he had exposure to and knowledge of the wrongdoing alleged, including any "red flags." Pilette cannot realistically distance himself from the misconduct alleged herein. Pilette is therefore incapable of impartially considering a demand to commence this action.

181.    Furthermore, Defendants Brandt, Dangeard, Denzel, and Unruh have all been members of the Audit Committee during the relevant period, and are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the committee. As stated in the 2020 Proxy Statement, the Audit Committee's charter imposes specific duties on members of this committee to, among other things, "Review[] our Company's practices with respect to risk assessment and risk management and meet with management and members of internal audit to discuss our Company's significant risk exposures and the steps management has taken to monitor, control and mitigate such exposures."

182.     In accordance with its charter, the Audit Committee also reviews the Company's policies and practices with respect to the financial reporting and control

SHAREHOLDER DERIVATIVE COMPLAINT

1   aspects of risk management, and must review the status of risk oversight activities

2   performed by the Board and its other committees.

3        183.   As members of the Audit Committee, Defendants Brandt, Dangeard,

4   Denzel, and Unruh violated their fiduciary duties to act in good faith to address the

5   pervasive legal violations discussed herein, including the unlawful pay equity gap and

6   discrimination against women and minorities with respect to hiring and promotion.

7   Accordingly, Defendants Brandt, Dangeard, Denzel, and Unruh face a substantial

8   likelihood of liability and cannot impartially consider a demand. Therefore, demand is

9   excused with respect to these defendants.

10       184.   Furthermore, the Director Defendants were on the Board during the

11  relevant period, and thus were exposed to and had knowledge of the "red flags" alleged

12  herein regarding unlawful discrimination and failure to abide by the Company's stated

13  policies to promote diversity. The directors' inaction in the face of red flags subjects

14  them to a substantial likelihood of liability for their conduct and, therefore, demand is

15  excused.

16       185.   The Board is likewise conflicted from and unable to pursue

17  NortonLifeLock's claims against members of the Company's management, including

18  Defendant Pilette and Clark. Any effort to prosecute such claims against these

19  Defendants for their direct roles in implementing a business strategy designed to ignore

20  or otherwise circumvent federal and state laws prohibiting discrimination would

21  necessarily expose the Board's own culpability for the very same conduct. In other

22  words, given that the Board had been on notice of the wrongdoing, any effort by the

23  Board to hold Defendants liable would surely lead these executives to defend on the

24  ground that their own conduct was consistent with NortonLifeLock's corporate policy

25  and practice, as established by and known to the Board.

26  / / /

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

### C.   The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith

186.   Under Delaware law and NortonLifeLock's Corporate Governance Principles, the Board, as the Company's highest decision-making body, is charged with ensuring that processes are in place for ensuring legal and regulatory compliance. This is particularly true when such compliance concerns a core operation of the Company such as its employment practices. Here, the misconduct alleged was pervasive, took place over many years, and involved the Company's core business operations since the employment practices affected all Company operations. Organized and long-running violations of the law do not result from an isolated failure of oversight. The entire Board was obligated to oversee the Company's risk, including potential liability for NortonLifeLock's violations of federal and state laws regarding discrimination. At the very least, the Director Defendants consciously turned a blind eye to these pervasive violations of law, creating a substantial likelihood of liability. Accordingly, demand is excused.

187.   All of the Board's directors, at the time this action was initiated, failed to act in the face of known duties. Indeed, as explained herein, they were presented with – but consciously ignored (and/or perpetuated) – substantial "red flag" warnings that NortonLifeLock was discriminating against Blacks and other minorities with respect to hiring, promotion, and evaluation of Board candidates.  The Board also knew that the Company's workforce has consistently only had 2% or less African American workers, and only 1% of African Americans in leadership positions.  The Board was also aware of other systematic gender discrimination at NortonLifeLock, as reflected in the Company's 2018 Pay Equity Gap Report.

188.   These and other wrongful acts have caused and will continue to cause the Company to be subjected to significant potential fines and penalties and numerous lawsuits. They have also resulted in severe harm to the Company's business reputation. Since the wrongdoing and harm alleged in this Complaint flows directly from the

SHAREHOLDER DERIVATIVE COMPLAINT

Board's conscious decision to permit the sustained and systemic violations of law in question, the Director Defendants are incapable of exercising the independent judgment required to determine whether the initiation of an action against the Defendants is appropriate.

## X.   CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–30

189.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.   The Individual Defendants and Does 1–30 owed and owe the Company fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

191.   The Individual Defendants and Does 1–30, and each of them, as a result of the facts alleged herein, violated and breached their fiduciary duties of candor, good faith, and loyalty.

192.   As a direct and proximate result of the Individual Defendants' and Does 1–30's breaches of their fiduciary obligations, the Company has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

### COUNT II
### Aiding and Abetting Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–30

193.   Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

194.   Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to the Company.

SHAREHOLDER DERIVATIVE COMPLAINT

195.    The Individual Defendants owed the Company certain fiduciary duties as fully set out herein.  By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to the Company.

196.    Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties.  Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

197.    The Company was injured as a direct and proximate result of the aforementioned acts.

## COUNT III
### Abuse of Control
### Against all Defendants

198.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

199.    By virtue of their positions and financial holdings at NortonLifeLock, the Director Defendants exercised control over NortonLifeLock and its operations, and owed duties as controlling persons to NortonLifeLock not to use their positions of control for their own personal interests and contrary to NortonLifeLock's interests.

200.    Defendants' conduct alleged herein constitutes an abuse of their ability to control and influence the Company, for which they are legally responsible.

201.    As a result of Defendants' abuse of control, the Company has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

///

///

SHAREHOLDER DERIVATIVE COMPLAINT

**COUNT IV**
**Unjust Enrichment**
**Against All Individual Defendants and Does 1–30**

202.  Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

203.  By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

204.  During the Relevant Period, the Individual Defendants either received annual stipends, bonuses, stock options, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

205.  Plaintiff, as shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

206.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT V**
**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**Against All Individual Defendants**

207.  Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

208.  SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

SHAREHOLDER DERIVATIVE COMPLAINT

No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

209. Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2018, 2019, and 2020 Proxy Statements. The Proxy Statements contained proposals to the Company's stockholders urging them to reelect the members of the Board and to approve "say on pay" executive compensation proposals. The 2018, 2019, and 2020 Proxy Statements were false and misleading because they omitted and failed to disclose:

(a) That the statement in the Proxies that "diversity is one of the numerous criteria the Nominating and Governance Committee reviews before recommending a candidate" was misleading because it suggested that the Company was actively seeking to achieve racial and ethnic diversity in its Board membership, while the undisclosed reality is that NortonLifeLock either has no intention to actually nominate such persons to its Board or it engages in efforts to thwart the nomination of such persons and prefers non-diverse applicants in the pool;

(b) That the Company does not have term limits due to a desire to retain the experience of the incumbent Director Defendants, but instead to keep minorities off the Board;

(c) That the Company's failure to disclose its median salary and pay/employment data in an annual report is due to a desire to conceal existing, known pay disparity at the Company which adversely affects women and minorities;

SHAREHOLDER DERIVATIVE COMPLAINT

(d)     That the Company's executive compensation decisions do not take into consideration in any way the executives' success or lack thereof in achieving the Company's diversity and inclusion goals; moreover, that the Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with;

(e)     That the Board's Nominating and Governance Committee did not take racial and ethnic diversity into consideration when nominating Board candidates and instead simply sought to create a false appearance of seeking diversity among potential Board candidates;

(f)     That Defendants had knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access;

(g)     That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to diversity and inclusion were being complied with;

(h)   That the statement in the Proxies that "the composition of the Board should reflect the benefits of diversity as to gender, race, ethnic, cultural and geographic backgrounds that reflect the composition of our global investors, customers, employees and partners" was misleading in that it failed to disclose that the Board composition did not in fact reflect the gender, race, ethnic, cultural, and geographic backgrounds reflective of the composition of the Company's investors, customers, employees and partners; and

(i)     That the Company's diversity and inclusion programs were not achieving measurable and actionable results, and needed substantial improvement.

67

SHAREHOLDER DERIVATIVE COMPLAINT

210.    By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendation to reelect the current Board and vote in favor of executive compensation proposals.

211.    Plaintiff, on behalf of the Company, seeks injunctive and equitable relief because the conduct of the Individual Defendants interfered with Plaintiff's voting rights and choices at the 2018, 2019 and 2020 annual meetings.  Plaintiff does not seek any monetary damages for the proxy law violations.

212.    This action was timely commenced within three years of the date of the 2019 and 2020 Proxy Statements and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, requests judgment and relief as follows:

A.    Against all of the Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company along with pre- and post-judgment interest as allowed by law resulting from Defendants' breaches of fiduciary duty;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

SHAREHOLDER DERIVATIVE COMPLAINT

(1)     The Chief People and Culture Officer should immediately create a substantive plan for diversity and inclusion for the Board, upper management levels, and throughout the corporation with the authority to implement such a plan; and if unable to do so, the Chief People and Culture Officer shall be replaced by a person of color with the skill set and authority to do so;

(2)     At least one of NortonLifeLock's directors should immediately resign prior to the Company's annual meeting set for September 8, 2020 and a Black person nominated to the Board at that time. Thereafter, within a year and prior to the next annual meeting at least one other person of color shall be nominated to the Board;

(3)     All Director Defendants named in this suit should return all of their 2020 compensation received from NortonLifeLock (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Blacks and minorities in corporate America;

(4)     NortonLifeLock should agree to publish an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at NortonLifeLock;

(5)     NortonLifeLock should create a $500 million fund to hire Blacks and minorities, promote minorities to more management positions at the Company, establish and maintain a mentorship program at NortonLifeLock for minorities that is committed to providing the skills and mentorship necessary to succeed in corporate America;

SHAREHOLDER DERIVATIVE COMPLAINT

(6)     NortonLifeLock should require annual training of its entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics; and

(7)     NortonLifeLock should immediately set specific goals with respect to the number of Blacks and minorities to hire at the Company over the next five years, and NortonLifeLock should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals.

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of NortonLifeLock has an effective remedy;

D.     Awarding to NortonLifeLock restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E.     Awarding punitive damages at the maximum amount permitted by law;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

///

///

///

///

///

///

70

SHAREHOLDER DERIVATIVE COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of NortonLifeLock, hereby demands a trial by jury of all issues that are subject to adjudication by a trier of fact.

Dated:  August 5, 2020

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)


s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
Email:        fbottini@bottinilaw.com
              achang@bottinilaw.com
              ykolesnikov@bottinilaw.com

RENNE PUBLIC LAW GROUP
Louise H. Renne (SBN 36508)
Ruth M. Bond (SBN 214582)
Ann M. Ravel (SBN 296182)
350 Sansome Street, Suite 300
San Francisco, CA 94101
Telephone:  (415) 848-7200
Facsimile:    (415) 848-7230
Email:        lrenne@publiclawgroup.com
              rbond@publiclawgroup.com
              ann.ravel@gmail.com

*Attorneys for Plaintiff EllieMaria Toronto ESA*

71

# VERIFICATION

I, Sal Toronto, verify that I am the custodian of the EllieMaria

Toronto ESA, which is a shareholder of NortonLifeLock Inc.  I have

reviewed the allegations in this Verified Shareholder Derivative

Complaint.  As to those allegations of which I have personal knowledge, I

believe them to be true; as to those allegations of which I lack personal

knowledge, I rely upon my counsel and counsel's investigation, and

believe them to be true.  Having received a copy of the complaint and

reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and

correct.  Executed on July 24, 2020.


*Sal Toronto*

_____

Sal Toronto, Custodian of the
Elliemaria Toronto ESA